25 A.3d 277

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Steven HUTCHINSON, Appellant.**

Supreme Court of Pennsylvania.

Submitted June 26, 2008.

Decided Aug. 22, 2011.

288

290

David Lee Zuckerman, Defender Association of Philadelphia, Philadelphia, for Steven Hutchinson.

Hugh J. Burns, Jr., Philadelphia District Attorney's Office, Philadelphia, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

## OPINION

Justice McCAFFERY.

This is an appeal from the denial of guilt phase relief sought by Steven Hutchinson ("Appellant") in a petition filed pursuant to the Post Conviction Relief Act ("PCRA").[1] Concluding that the ruling of the PCRA court is supported by the record and free of legal error, we affirm.

On December 9, 1999, a jury convicted Appellant of first-degree murder and other crimes for shooting to death one of his girlfriends, Stephanie Epps, in front of her two young children. The children had testified at trial, unequivocally identifying Appellant as the individual who had shot their mother. Appellant had presented an alibi defense, attempted to undermine the credibility of the children's testimony, and advanced the theory that the victim's estranged husband was responsible for the murder. The jury returned a verdict of death, and on direct appeal, this Court affirmed both Appellant's conviction and death sentence. *Commonwealth v. Hutchinson*, 571 Pa. 45, 811 A.2d 556 (2002). Appellant then filed a PCRA petition, raising numerous guilt and penalty phase claims. After oral argument on February 21, 2006, and with the agreement of the Commonwealth, the PCRA court

---

1. 42 Pa.C.S. §§ 9541–46.

entered an order on July 25, 2006, granting Appellant a new penalty phase hearing. Shortly thereafter, on August 9, 2006, the same court entered another order denying all of Appellant's guilt phase claims. Appellant has now appealed from the denial of his guilt phase claims, raising ten issues for our review.[2]

2. Appellant raises the following issues, which we have reordered for ease of disposition but reproduced verbatim:

1. Did the Commonwealth use its peremptory strikes in a discriminatory manner; and were trial and appellate counsel ineffective for failing to object and raise this claim in violation of the Sixth and Fourteenth Amendments and the corresponding provisions of the Pennsylvania Constitution?

2. Was Appellant was denied his rights to due process under the United States Constitution and the corresponding provisions of the Pennsylvania Constitution when the juvenile witnesses were colloquies as to competency in the presence of the jury; and were trial and appellate counsel ineffective for failing to object and raise this claim?

3. Was Appellant denied his rights under the Sixth and Fourteenth Amendments and the corresponding provisions of the Pennsylvania Constitution where the Commonwealth introduced evidence of other bad acts including Appellant's propensity for violence and the court failed to give a cautionary instruction to the jury; and were trial and appellate counsel ineffective for failing to object and raise this claim?

4. Was Appellant denied a fair trial in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Pennsylvania Constitution as a result of prosecutorial misconduct; and were trial and appellate counsel ineffective for failing to object and raise these claims?

5. Was Appellant denied his rights under the Sixth and Fourteenth Amendments and the corresponding provisions of the Pennsylvania Constitution where trial counsel ineffectively failed to investigate, discuss with Appellant, or present, voluntary intoxication, diminished capacity and heat of passion defenses; was appellate counsel ineffective for failing to raise, brief and argue this issue on appeal?

6. Was Appellant denied his right to due process under the United States Constitution and the corresponding provisions of the Pennsylvania Constitution when the trial court improperly limited the closing argument of Appellant's counsel; and were trial and appellate counsel ineffective for failing to object and raise this claim?

7. Is Appellant entitled to relief from his conviction because of the cumulative prejudicial effect of the errors denied him due process and all prior counsel were ineffective to the extent they failed to properly object, raise and litigate these claims at trial and on direct appeal?

8. Was Appellant denied his rights under the Sixth and Fourteenth United States Constitution and the corresponding provisions of the

 Our standard of review requires us to determine whether the ruling of the PCRA court is supported by the record and is free of legal error. *Commonwealth v. Marshall,* 596 Pa. 587, 947 A.2d 714, 719 (2008). The PCRA court's credibility determinations are binding on this Court when they are supported by the record. *Commonwealth v. Johnson,* 600 Pa. 329, 966 A.2d 523, 532, 539 (2009). However, this Court applies a *de novo* standard of review to the PCRA court's legal conclusions. *Commonwealth v. Rios,* 591 Pa. 583, 920 A.2d 790, 810 (2007).

To prevail on a petition for PCRA relief, a petitioner must plead and prove by a preponderance of the evidence that his or her conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). These circumstances include a violation of the Pennsylvania or United States Constitution or ineffectiveness of counsel, either of which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i) and (ii). In addition, a petitioner must show that the claims of error have not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). An issue has been waived "if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state post[-]conviction proceeding." 42 Pa.C.S. § 9544(b). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2).

 The PCRA court has the discretion to dismiss a petition without a hearing when the court is satisfied "that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by any further proceed-

Pennsylvania Constitution when the PCRA court failed to recuse itself upon motion of Appellant?
9. Was Appellant entitled to an Evidentiary Hearing?
10. Did the trial court err in dismissing Appellant's claims of trial error without notice as required by Pa.R.Crim.P. 909(B)(2)?
Appellant's Brief at 3–4.

ings." Pa.R.Crim.P. 909(B)(2). "[T]o obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." *Commonwealth v. D'Amato*, 579 Pa. 490, 856 A.2d 806, 820 (2004).

Appellant's first seven issues allege ineffective assistance of his trial counsel and appellate counsel. We begin our analysis of these issues with the presumption that counsel is effective; the burden of proving otherwise rests with the petitioner. *Commonwealth v. Cox*, 603 Pa. 223, 983 A.2d 666, 678 (2009). Accordingly, to prevail on his claims of ineffective assistance of counsel, Appellant must plead and prove, by a preponderance of the evidence, three elements: (1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) Appellant suffered prejudice because of counsel's action or inaction. *Commonwealth v. Steele*, 599 Pa. 341, 961 A.2d 786, 796 (2008) (citing, *inter alia, Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987)). With regard to the second, *i.e.*, the "reasonable basis" prong, we will conclude that counsel's chosen strategy lacked a reasonable basis only if Appellant proves that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Cox, supra* at 678 (quoting *Commonwealth v. Williams*, 587 Pa. 304, 899 A.2d 1060, 1064 (2006)). To establish the third prong, Appellant must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction. *Commonwealth v. Dennis*, 597 Pa. 159, 950 A.2d 945, 954 (2008).

Because Appellant's direct appeal was decided in October 2002, approximately two months before this Court's decision in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), Appellant was required to raise claims of trial counsel ineffectiveness at the time that he obtained new counsel. *See*

*Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977) (requiring that a petitioner raise claims of trial counsel ineffectiveness at the time he or she obtained new counsel). Although this Court overruled *Hubbard* in *Grant, Hubbard* was the prevailing law when Appellant's direct appeal was decided. *See Commonwealth v. Clark,* 599 Pa. 204, 961 A.2d 80, 85 (2008). Therefore, because the record shows that new counsel was appointed to represent Appellant on direct appeal, Appellant was required to raise claims of trial counsel ineffectiveness at that time.[3] Accordingly, pursuant to the PCRA's statutory mandates, any claims of trial counsel ineffectiveness not raised on direct appeal have been waived. *See* 42 Pa.C.S. § 9544(b); *Commonwealth v. Tedford,* 598 Pa. 639, 960 A.2d 1, 13 (2008).

Appellant may properly raise claims of appellate counsel ineffectiveness under the PCRA, including claims of appellate counsel ineffectiveness grounded in a failure to raise trial counsel ineffectiveness on direct appeal. *Cox, supra* at 678–79; *Dennis, supra* at 954–55; *Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 595 (2007) (citing *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014, 1022 (2003)). However, such claims must be "layered," *i.e.,* argument must be presented as to each prong of the *Pierce* test for each layer of allegedly defective representation. *Dennis, supra* at 954–55; *Washington, supra* at 595. To establish the first, *i.e.,* the "arguable merit" prong of a claim of appellate counsel ineffectiveness for failure to raise a claim of trial counsel ineffectiveness, a petitioner must prove that trial counsel was ineffective under the *Pierce* standard. *Dennis, supra* at 955; *Washington, supra* at 595. If a petitioner cannot prove that trial counsel was ineffective, then petitioner's derivative claim of appellate counsel ineffectiveness must also fail, and the court need not consider the other two prongs of the *Pierce* test as

3. Appellant's contention that he was represented at trial and on direct appeal by the same attorney is not supported by the record. Appellant was represented at trial by Stephen P. Patrizio, Esq., who, on April 27, 2000, after filing a notice of appeal, was permitted by this Court to withdraw. On July 11, 2000, James S. Bruno, Esq., entered his appearance on behalf of Appellant before this Court.

applied to appellate counsel ineffectiveness. *Commonwealth v. Rainey,* 593 Pa. 67, 928 A.2d 215, 224 (2007).

It is important to recognize that a claim of appellate counsel ineffectiveness for failing to raise a claim of trial counsel ineffectiveness is distinct from a claim of appellate counsel ineffectiveness grounded in the manner in which appellate counsel litigated a claim of trial counsel ineffectiveness on appeal. *See Tedford, supra* at 16. In the former case, the claim of trial counsel ineffectiveness has been waived, and the appellant must show that appellate counsel was ineffective for failing to raise the claim; however, in the latter case, the claim of trial counsel ineffectiveness claims has been previously litigated, and the appellant must show that appellate counsel was ineffective in the manner in which he or she litigated the claim.

We turn now to Appellant's claims of appellate counsel ineffectiveness.

### 1. *Batson* Claim of Racial Discrimination in Jury Selection

In Appellant's first issue, he contends that trial and direct appeal counsel were ineffective for failing to raise the claim that the Commonwealth had used its peremptory strikes in a discriminatory manner, in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *See* Appellant's Brief at 13. To support this contention, Appellant proffers the following: (1) the prosecutor struck African–American venirepersons at approximately twice the rate of non-African-American venirepersons; and (2) a policy of racial discrimination in jury selection within the Philadelphia District Attorney's Office was allegedly suggested by the existence of two particular training lectures, delivered by then-Assistant District Attorneys Jack McMahon and Bruce Sagel.

In *Batson, supra* at 89, 106 S.Ct. 1712, the United States Supreme Court held that "the Equal Protection Clause forbids a prosecutor to challenge potential jurors solely on account of their race." Accordingly, the United States Supreme Court permitted "an individual defendant to show that he was denied

■■■■■■■

equal protection by the prosecutor's improper exercise of peremptory challenges in a racially discriminatory manner in his individual case." *Commonwealth v. Daniels*, 600 Pa. 1, 963 A.2d 409, 434 (2009). We have previously explained the framework for analyzing a *Batson* claim as follows:

> First, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination. *Batson*, 476 U.S. at 97, 106 S.Ct. 1712.

*Commonwealth v. Cook*, 597 Pa. 572, 952 A.2d 594, 602 (2008) (quoting *Commonwealth v. Harris*, 572 Pa. 489, 817 A.2d 1033, 1042 (2002)).

■■■ However, when, as here, defense counsel did not raise or preserve any claim of racial discrimination in jury selection with a contemporaneous *Batson* objection at trial, we have repeatedly held that the *Batson* framework does not apply. *See, e.g., Commonwealth v. Ligons*, 601 Pa. 103, 971 A.2d 1125, 1142 (2009); [4] *Daniels, supra* at 434 (citing *Commonwealth v. Uderra*, 580 Pa. 492, 862 A.2d 74, 87 (2004)). Rather, when a claim of racial discrimination in jury selection has not been preserved, a post-conviction petitioner "bears the burden in the first instance and throughout of establishing actual, pur-

4. Justice Baer authored the lead opinion in *Ligons*, joined only by Justice Todd. Chief Justice Castille authored a concurring opinion, joined by Justices Eakin and McCaffery. Justice Saylor authored a concurring and dissenting opinion. However, with regard to the *Batson* issue, most if not all justices were in agreement and joined the lead opinion. *See Ligons, supra* at 1170 (Concurring Opinion, Castille, C.J.); *id.* at 1171 (Concurring and Dissenting Opinion, Saylor, J.). Chief Justice Castille concluded that the lead opinion was a majority expression with respect to the numerous points of joinder and thus was "properly referred to as a majority opinion." *Id.* at 1159 n. 1 (Concurring Opinion, Castille, C.J.).

poseful discrimination by a preponderance of the evidence."
*Ligons, supra* at 1142.

In the instant case, Appellant contends that he has established a pattern of racial discrimination in jury selection based on the disparity in the percentages of African–American versus white venirepersons that the prosecutor struck by peremptory challenges. He alleges that Assistant District Attorney William Fisher, who prosecuted his case, struck 10 out of 16 African–American venirepersons (62.5%), but struck only 8 out of 25 non-African-American venirepersons (32.0%), yielding a jury composed of 3 African–Americans, 8 white persons, and 1 person of unknown race. *See* Appellant's Brief at 14–15 & n. 7.

In denying Appellant's claim, the PCRA court pointed out that 53 persons were eligible to be struck by either the Commonwealth or the defense; of this total, 20 were African–American and 33 were non-African-American. The Commonwealth used 18 of its available 20 peremptory strikes, 10 against African–Americans and 8 against non-African-Americans. The defense used 21 strikes, 8 against African–Americans and 13 against non-African-Americans. Of the 8 African–Americans struck by the defense, the Commonwealth had accepted 4 of them before they were struck by the defense. PCRA Court Opinion, dated 10/25/06, at 3. The PCRA court determined that the *voir dire* record as a whole refuted on its face Appellant's claim of discrimination in jury selection. *Id.* We see no abuse of discretion with regard to the PCRA court's determination, and repeat our conclusion in *Ligons, supra* at 1144: "While it is clear that the prosecutor peremptorily struck more African Americans than Caucasians, this fact, in and of itself, is insufficient to demonstrate purposeful discrimination when considering the totality of the circumstances."

The additional allegations that Appellant proffers, even when taken together with the argument based on peremptory strikes discussed above, likewise do not demonstrate purposeful discrimination. Appellant contends that, in seven other

capital cases tried before juries between 1991 and 1997, Mr. Fisher likewise struck a higher percentage of African–American venirepersons than non-African-Americans. Appellant proffers similar statistics for the District Attorney's Office as a whole.[5] We have previously held that such statistical analyses, taken individually or collectively, do not satisfy a petitioner's burden to establish actual, purposeful discrimination in his or her own case. *Ligons, supra* at 1145.

The only other evidence that Appellant proffers to support his *Batson* claim is the existence of the McMahon and Sagel training lectures. Appellant references specifically a videotape of the McMahon lecture and handwritten notes by then-A.D.A. Gavin Lentz from the Sagel lecture. On numerous occasions, we have condemned in the strongest possible terms the tactics and practices expounded in the McMahon lecture as violative of basic constitutional principles. *See, e.g., Commonwealth v. Marshall*, 596 Pa. 587, 947 A.2d 714, 722 (2008); *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 731 n. 12 (2000). We do so again here. However, we have also made clear that the mere existence of the McMahon and Sagel lectures establishes neither a general policy in the District Attorney's Office of racial discrimination in jury selection, nor the presence of racial discrimination in jury selection in an individual case when a prosecutor other than McMahon or Sagel represented the Commonwealth. *See Ligons, supra* at 1145–46 (rejecting the appellant's *Batson* claim of a "culture of discrimination" based on the McMahon lecture videotape and Sagel lecture notes because there was no connection to the appellant's individual case); *Clark*, 961 A.2d at 96 (rejecting a *Batson* claim that was based on the McMahon lecture videotape and Sagel lecture notes and emphasizing that "the evi-

5. Specifically, Appellant contends that, in seven other capital prosecutions between 1991 and 1997, Mr. Fisher struck via peremptory challenge 44 out of 92 African–American venirepersons (48%), but only 29 out of 105 non-African-American venirepersons (28%). Similarly, Appellant contends that the District Attorney's Office as a whole "over this time period" struck via peremptory challenge 1,113 out of 2,250 African–American venirepersons (49%), but only 786 out of 3,149 non-African-American venirepersons (25%). *See* Appellant's Brief at 15 & n. 8.

dence offered in a *Batson* claim must be grounded in the particular facts of the appellant's case"); *Marshall, supra* at 722 & n. 7 (rejecting the appellant's *Batson* claim based on the McMahon lecture videotape and Sagel lecture notes because neither McMahon nor Sagel was involved in the appellant's prosecution); *Commonwealth v. Bond,* 572 Pa. 588, 819 A.2d 33, 48–49 (2002) (rejecting a *Batson* claim because Mr. McMahon had not prosecuted the case, and the appellant offered only speculation that the McMahon training lecture had, in any way, affected the assistant district attorney who did try his case years later); *Commonwealth v. Lark,* 560 Pa. 487, 746 A.2d 585, 589 (2000) (rejecting the suggestion that Mr. McMahon's statements in the training lecture governed the conduct of a different prosecutor merely based on the fact that both attorneys worked in the Philadelphia District Attorney's Office).

In Appellant's case, the prosecutor was William Fisher, and Appellant has not alleged any connection between Mr. Fisher and either Mr. McMahon or Mr. Sagel or their lectures. Furthermore, the two lectures were delivered, respectively, twelve and nine years before Appellant's trial.[6]

In sum, we conclude that the denial of Appellant's *Batson* claim by the PCRA court is supported by the record and is legally sound. Appellant's proffered evidence does not establish actual, purposeful discrimination in jury selection. Appellant has cited no occurrence at trial, no words of the prosecutor or defense counsel or trial judge, and no action by the court that could lead to an inference of racial discrimination in jury selection. Because Appellant's *Batson* claim is meritless, he is unable to prove a claim of trial counsel ineffectiveness for failing to raise a *Batson* objection at trial, and hence his derivative claim of appellate counsel ineffectiveness also must fail.

6. The McMahon and Sagel lectures were delivered, respectively, in 1987 and 1990. Philadelphia Magazine brought both of the lectures to public attention in June 1997. *See Marshall,* 947 A.2d at 717–18. Appellant's trial took place in 1999.

### 2. Colloquy of Juvenile Witnesses in the Presence of the Jury

In Appellant's second issue, he asserts that trial counsel and direct appeal counsel were ineffective for failing, respectively, to object to and to raise a claim regarding the presence of the jury during the colloquy to determine competency of the two juvenile witnesses. The witnesses in question were the victim's minor children, Desiree, a nine-year old girl, and Philip, a twelve-year-old boy,[7] both of whom had witnessed the murder of their mother. Appellant contends that the presence of the jury during the colloquy of these witnesses constituted *per se* error under the rule promulgated by this Court in *Commonwealth v. Washington*, 554 Pa. 559, 722 A.2d 643 (1998).

Although competency of a witness is generally presumed, Pennsylvania law requires that a child witness be examined for competency. *See Commonwealth v. Delbridge*, 578 Pa. 641, 855 A.2d 27, 39 (2003) (citing *Rosche v. McCoy*, 397 Pa. 615, 156 A.2d 307, 310 (1959) and Pa.R.E. 601).[8] As we have recently reiterated, "this Court historically has required that witnesses under the age of fourteen be subject to judicial inquiry into their testimonial capacity." *Commonwealth v. Ali*, 10 A.3d 282, 300 n. 11 (Pa.2010). "A competency hearing of a minor witness is directed to the mental capacity of that witness to perceive the nature of the events about which he or she is called to testify, to understand questions about that subject matter, to communicate about the subject at issue, to recall information, to distinguish fact from fantasy,

---

7. The children were nine and twelve, respectively, *at the time of trial,* which took place approximately 26 months after their mother's murder.

8. Pa.R.E. 601(a) provides as follows:

> **General Rule.** Every person is competent to be a witness except as otherwise provided by statute or in these Rules.

The Comment to Rule 601 expressly states that Pa.R.E. 601 "is intended to preserve existing Pennsylvania law."

In *Rosche v. McCoy*, 397 Pa. 615, 156 A.2d 307, 310 (1959), this Court stated that, under the prevailing rule, competency was presumed when the witness was over 14 years of age; however, when the witness was under 14 years of age, "there must be judicial inquiry as to mental capacity, which must be more searching in proportion to chronological immaturity."

and to tell the truth." *Delbridge, supra* at 45. In Pennsylvania, competency is a threshold legal issue, to be decided by the trial court. *Commonwealth v. Dowling,* 584 Pa. 396, 883 A.2d 570, 576 (2005).

In *Washington, supra,* the decision on which Appellant relies, defense counsel raised a challenge to the competency of the two complainants, who were eight and nine years old at the time of the appellant's trial for sexual offenses against them. Defense counsel sought a competency hearing outside the presence of the jury, but the trial judge denied this motion; instead, the prosecutor and defense counsel conducted *voir dire* of the child witnesses before the jury. *Id.* at 644–45. The children were questioned about a variety of personal matters, including their ages, birthdays, siblings, schools, teachers, and Christmas presents; about discussions with the assistant district attorney regarding their testimony; and about the difference between telling the truth and telling a lie. *Id.* at 645. When, at the end of *voir dire,* defense counsel objected to the witnesses' competency, the trial judge overruled the objection and specifically stated in the presence of the jury that the witnesses were competent. *Id.* No cautionary instruction was given to the jury regarding the significance or limitations of this ruling. Trial proceeded, and the appellant was convicted. On appeal before this Court, the appellant argued that permitting the jury to observe *voir dire* and to hear the trial court's competency ruling left the impression that the trial court was endorsing the credibility of the witnesses. *Id.* In addition, the appellant argued that the witnesses' repeated assertions that they were telling the truth unfairly bolstered their testimony. *Id.* at 645–46.

A majority of this Court accepted the *Washington* appellant's arguments and accordingly granted him a new trial. In reaching this decision, the Court first reiterated the distinction between a competency determination, which is a legal issue for the court, and a credibility determination, which is a factual issue for the jury, and then concluded that the "invariable result of a jury's presence during competency proceedings is that the truth determining process exclusively reserved for

the jury is influenced by the inquiry into competency." *Id.* at 646. Thus, even with a cautionary instruction, which was not given in *Washington*, when the competency proceedings take place in the presence of the jury, they "inevitably permeate[ ] into the veracity determination assigned exclusively to the jury." *Id.* at 647. Moreover, the Court expressed concern that a trial judge's ruling of competence would be interpreted by the jury as a judicial endorsement of the witness's credibility. *Id.* at 646. Based on these considerations, the Court set forth a *per se* rule requiring that the jury not be present during a competency hearing for a child witness. *Id.* at 647.

In promulgating this rule, the Court recognized that some "foundational questioning" might be duplicated during the trial proceedings. Such duplication arises from the fact that evidence relevant to the foundational requirement of competency is also relevant, in many instances, to the weight and credibility accorded to a witness's testimony. *Washington, supra* at 647 (citing *State v. Harris*, 1988 WL 38034 (Ohio App. 5 Dist.1988)); *see also id.* at 648 (Castille, J., dissenting opinion) (arguing that *voir dire* of a child witness is more appropriately conducted in the *presence* of the jury because the jury, in order to assess credibility and weight to be accorded the testimony, must be able to determine whether the child understands the meaning of an oath to tell the truth).[9]

9. It is notable that different jurisdictions have promulgated very different rules as to how—or even if—a hearing to determine the competency of a child witness is to be conducted. Courts and commentators have recognized a "trend that has converted questions of competency into questions of credibility." 3 Weinstein's Federal Evidence § 601.02[1] (quoted in *State v. Hueglin*, 130 N.M. 54, 16 P.3d 1113, 1117 (App. 2000)); *see also Johnson v. United States*, 364 A.2d 1198, 1202 n. 12 (D.C.1976) (citing McCormick, Evidence § 62 (2d ed.1972) ("The current trend is to regard the competency of a witness as a question of credibility for the jury and to admit the testimony for what it is worth.")).

Wisconsin law exemplifies such a trend. Prior to 1974, under Wisconsin law, the competency of a child witness was a question to be determined by the court; however, when the Wisconsin Supreme Court adopted new rules of evidence, effective January 1, 1974, the law as to competency determination dramatically changed. *See State v. Davis*, 66 Wis.2d 636, 225 N.W.2d 505, 510 (1975) (stating that, pursuant to the

new Wisconsin rule of evidence set forth at Wis. Stat. § 906.01, "every witness is competent to testify (with certain noted exceptions) and [ ] all former competency issues now are issues of credibility to be dealt with by the trier of fact"); *State v. Hanson*, 149 Wis.2d 474, 439 N.W.2d 133, 136 (1989) (holding that a trial judge erred as a matter of law in striking a child's testimony on the basis of competency because, under Wis. Stat. § 906.01, "competency is no longer a test for the admission of a witness' testimony [and the] only question is credibility which will be resolved when the case is submitted on the merits"); *State v. Dwyer*, 143 Wis.2d 448, 422 N.W.2d 121, 126 (App.1988) (explaining that the intention of new Section 906.01 "is to remove from judicial determination the question of competency and to submit the testimony to the jury so that it may assess its weight and credibility"); *State v. Daniels*, 117 Wis.2d 9, 343 N.W.2d 411, 414–15 (App.1983) (discussing the import of new Wis. Stat. § 906.01 in the context of a child witness).

In the federal courts, "every person is competent to be a witness," *see* Fed.R.Evid. 601, and "[a] child is presumed to be competent" to be a witness, *see* 18 U.S.C. § 3509(c)(2). The court may conduct a competency examination regarding a proffered child witness only if the court determines, on the record, that compelling reasons exist for such examination. 18 U.S.C. § 3509(c)(4). "A child's age alone is not a compelling reason." *Id.* If the court concludes that compelling reasons exist for a competency examination of a child witness, it must be conducted in the absence of the jury. 18 U.S.C. § 3509(c)(6). *See also United States v. Allen J.*, 127 F.3d 1292 (10th Cir.1997) (upholding the district court's refusal to hold a competency examination for a twelve-year-old female victim of sexual abuse after the defendant challenged her competence to testify based on evidence that she suffered from developmental delays and mild mental retardation).

In many other jurisdictions, as in Pennsylvania, the competency of a child witness to testify in court remains a threshold question of law, resting within the sound discretion of the trial court. However, opinions have varied as to whether *voir dire* of the child witness should be conducted in the presence or absence of the jury. *See Washington*, 722 A.2d at 646 n. 4 and n. 5 (citing holdings from various jurisdictions on this issue). In the District of Columbia, *voir dire* of a child witness may be conducted in the presence or absence of the jury, at the discretion of the trial court. *See O'Brien v. United States*, 962 A.2d 282, 302 (D.C.2008); *Barnes v. United States*, 600 A.2d 821, 823 (D.C.1991); *Smith v. United States*, 414 A.2d 1189, 1198 (D.C.1980); *Brown v. United States*, 388 A.2d 451, 458 (D.C.1978). As the D.C. Court of Appeals stated in *Brown, supra* at 458, *voir dire* in the presence of the jury "assists the jurors in evaluating independently the child's qualifications as a witness." The *Brown* court held that the trial court did not commit reversible error in permitting a brief line of questioning in the presence of the jury as to the child witness's understanding of the distinction between truth and lies, concluding that such questioning may have aided the jury in assessing the credibility of the child's testimony and the weight to be accorded to it. Courts in Rhode Island and Missouri, on the other hand, have concluded that *voir dire* of a child witness should be conducted outside the presence of the jury. *State v. Girouard*, 561 A.2d 882, 885 (R.I.1989); *State v. Gantt*, 644 S.W.2d 656, 658 (Mo.Ct.App.1982).

In the instant case, there is no indication from the record that defense counsel challenged the competency of the juvenile witnesses at any time prior to, during, or after trial. There was no separate, formal competency hearing; rather, a brief *voir dire* of the juvenile witnesses was conducted at trial, in the presence of the jury, immediately prior to the witnesses' direct examination as to events on the day of their mother's murder. In its entirety, *voir dire* of Desiree, the victim's nine-year-old daughter, was as follows:

*Court Officer:* What is your name?

*Desiree:* Desiree.

*Court Officer:* Desiree, what is your last name?

*Desiree:* Epps

*Court Officer:* Do you know what the deference [sic] between telling the truth and telling a lie is?

*Desiree:* Yes.

*Court Officer:* If I asked you to swear on that Bible that you would tell the truth, the whole truth and so help you God, would you understand that?

*Desiree:* Yes.

*Court Officer:* Would you say yes if I asked you that?

*Desiree:* Yes.

*Court Officer:* Do you promise to tell the truth, the whole truth and nothing but the truth?

*Desiree:* Yes.

*Court Officer:* Thank you. The judge and these gentlemen here will talk to you. Please keep your voice up.

*Court:* Desiree, you will have to speak into that microphone. You will have to pretend that that red box in the back of that courtroom is where you are speaking to so everybody can hear you; all right?

*Desiree:* Yes.

*Court:* Because we need to hear what you have to say.

*Prosecutor:* Desiree, hello.

*Desiree:* Hello.

*Prosecutor:* Do you know who I am?

*Desiree:* Yes.

*Prosecutor:* Who are you [sic]?

*Desiree:* Mr. Fisher.

*Prosecutor:* Desiree, would you tell the jurors how old you are.

*Desiree:* Eight, I mean nine.

*Prosecutor:* When did you turn nine?

*Desiree:* September 14th.

*Prosecutor:* Desiree, you said that you know the difference between telling the truth and telling a lie; is that right?

*Desiree:* Yes.

*Prosecutor:* What's the difference between telling a lie and telling the truth; can you tell us?

*Desiree:* (no response).

*Prosecutor:* Let me ask you another question: If I told you this suit was red, would that be the truth or would it be a lie?

*Desiree:* A lie.

*Prosecutor:* If I said we were in your living room right now, would that be the truth or a lie?

*Desiree:* A lie.

*Prosecutor:* What grade are you in, Desiree?

*Desiree:* Fourth.

*Prosecutor:* How are you doing in school?

*Desiree:* Good.

*Prosecutor:* Some of us think C's are good. Tell us what good is.

*Desiree:* I got all A's and one B on my report card.

*Prosecutor:* That's actually very good. Did you get any awards or anything for doing that well?

*Desiree:* I got distinguished.

*Prosecutor:* You got distinguished?

*Desiree:* Yes.

*Prosecutor:* How many different kinds of awards could you get in school? Distinguished and what else?

*Desiree:* Distinguished and meritorious and honorable mention.

*Prosecutor:* So distinguished is the middle or highest?

*Desiree:* Highest.

*Prosecutor:* Then you're doing very, very, very good; right?

*Desiree:* Yes.

*Prosecutor:* And what school do you go to?

*Desiree:* Ivy Leaf Middle School.

*Prosecutor:* Ivy Leaf Middle School?

*Desiree:* Yes.

*Prosecutor:* How long have you gone there?

*Desiree:* I just started going there. I used to go to Ivy Leaf Elementary School.

*Prosecutor:* Now you graduated to middle school, right?

*Desiree:* Yes.

*Prosecutor:* Is that the same school your brother [Philip] goes to?

*Desiree:* Yes.

*Prosecutor:* Now, do you remember the last day that you saw your mom?

*Desiree:* Yes.

Notes of Testimony ("N.T."), 12/1/99, at 117–21.

The prosecutor then proceeded immediately to question Desiree concerning what she did and what she saw on the day of her mother's murder. At no point before, during, or after *voir dire* did defense counsel object to the *voir dire* format or questioning, and the trial court made no comment as to the witness's competency. After the prosecutor's direct examination of Desiree, defense counsel extensively cross-examined her, beginning with a few general questions concerning the year her mother was shot, her grade in school at that time, and her school and after-school programs. N.T., 12/2/99, at 8–11.

The next witness was the victim's twelve-year-old son, *voir dire* of whom consisted, in its entirety, of the following:

*Prosecutor:* Philip, how old are you?

*Philip:* I am 12.

*Prosecutor:* What grade are you in?

*Philip:* Seventh.

*Prosecutor:* I am sorry?

*Philip:* Seventh.

*Prosecutor:* Seventh grade?

*Philip:* Yes.

*Prosecutor:* What school do you go to?

*Philip:* Ivy Leaf.

*Prosecutor:* How are you doing in school now?

*Philip:* Good.

*Prosecutor:* What does good mean?

*Philip:* A's, B's and C's.

*Prosecutor:* In that order?

*Philip:* Excuse me?

*Prosecutor:* In that order, A's, B's and C's?

*Philip:* Yes.

*Prosecutor:* Are you related to Desiree Epps?

*Philip:* Yes.

*Prosecutor:* How are you related?

*Philip:* I am her brother.

*Prosecutor:* Were you related to Stephanie Coleman Epps?

*Philip:* Yes.

*Prosecutor:* How are you related to her?

*Philip:* I am her son.

*Prosecutor:* Did you know a person by the name of Mr. Steve?

*Philip:* Yes.

*Prosecutor:* How did you know him?

*Philip:* He was my mom's boyfriend.

*Prosecutor:* Do you see him in the room today?

*Philip:* Yes.

*Prosecutor:* Would you please point him out for us?

*Philip:* Right there.

*Prosecutor:* Indicating the defendant, your honor.

*Prosecutor:* Do you recall or do you remember when you first met him?

*Philip:* No, I don't remember.

*Prosecutor:* When you last saw your mom, where were you living?

*Philip:* I was living in the Bromley House Apartments.

*Prosecutor:* With whom were you living, Philip?

*Philip:* With my mom and my sister.

*Prosecutor:* Did sometimes Mr. Steve stay there—

*Philip:* Yes.

*Prosecutor:* At your apartment with you?

*Philip:* Yes.

*Prosecutor:* Philip, do you know the difference between telling a lie and telling the truth?

*Philip:* Yes.

*Prosecutor:* Could you tell us what the difference is, please?

*Philip:* Okay. The truth is like the right thing to do—Well, it is like the right thing to happen, and a lie is the opposite of the truth.

*Prosecutor:* That is pretty good. That is stated pretty good. The truth is telling about the thing the way it happened and a lie is telling something else—

*Philip:* Yes.

*Prosecutor:* That didn't happen, okay. Philip, do you recall the last day that you saw your mom?

*Philip:* It was in September. I think it was September 16, 1997.

N.T., 12/2/99, at 52–54.

The prosecutor then proceeded to ask Philip questions about his activities and his observations on the day of his mother's murder; following this examination, Philip was extensively cross-examined by defense counsel. At no point did

the trial court comment on or even mention Philip's competency to be a witness.

Appellant argues that trial counsel was ineffective for not objecting to the presence of the jury during the above *voir dire* of the children, and that appellate counsel was ineffective for failing to raise this issue of trial counsel ineffectiveness. Appellant relies on *Washington, supra,* wherein, as discussed above, this Court promulgated a *per se* rule that a competency hearing for child witnesses must be held in the absence of the jury.

Although the trial court held no formal, separate competency hearing, it is obvious from the above-quoted *voir dire* that the children were questioned as to their understanding of the concept of truth versus a lie immediately prior to their testimony concerning the murder of their mother. The jury heard all of the questions directed to the children and their answers. Accordingly, we acknowledge, as did the PCRA court, that there is arguable merit to Appellant's assertion that the trial court's *voir dire* procedure violated the *per se* rule promulgated in *Washington. See* PCRA Court Opinion, dated 10/25/06, at 4. However, following careful review of the entire record, we conclude that Appellant did not and cannot establish that he suffered prejudice because of defense counsel's failure to object, and thus Appellant cannot succeed in his ineffectiveness claim.

It is important to recognize that the trial court never issued an express or formal ruling that the children were competent to testify. In fact, the trial court never made any mention of the children's competency. The children's answers to questions about the distinction between truth and a lie flowed seamlessly into their testimony regarding their mother's murder. Thus, contrary to Appellant's contention, the trial court did not endorse or vouch for the credibility of any part of the children's testimony.

In addition, the trial court expressly and repeatedly instructed the jury that it was the sole fact-finder and sole judge

of credibility. In its initial remarks to the jury, the trial court stated the following:

> While you are decide [sic] on the facts of this case, you will have to judge the credibility and the weight of the testimony on the other evidence. By credibility I mean, of course, its truthfulness and its accuracy. When you judge the credibility and weight of a witnesses' [sic] testimony, you are deciding whether you will believe all, part or none of the testimony of the witness and how important that testimony is to the trial. Use your understanding of human nature and your own common sense. Please observe each witness as he or she testifies. Be alert for anything in that witness'[s] testimony or behavior or for any other evidence that might help you to judge the truthfulness, accuracy and weight of that person's testimony.
>
> * * *
>
> As I told you earlier, you are the sole judges of the facts and of the credibility and weight of the evidence. You must rely on your own recollection and evaluation of the evidence during your deliberations and not mine or counsel's. You are not bound by any opinion that counsel or I might express during the trial about guilt or innocence, credibility or weight of evidence, facts proven by the evidence or the inferences to be drawn by the facts.

N.T., 12/1/99, at 93–94, 96.

Similarly, in the charge to the jury just prior to the start of its deliberations, the court stated as follows:

> You will recall that I have told you that you are the sole determiners of the facts except where there are stipulations that have been reached by counsel.
>
> * * *
>
> Where there is a conflict in the testimony, you, the jury, have the duty of deciding which testimony to believe.... If you cannot reconcile the conflict in the testimony, it is up to

you to decide which testimony, if any, to believe and which to reject as untrue or inaccurate.

\* \* \*

As judges of the facts, you are the sole judges of the credibility of the witnesses and their testimony. This means that you must judge the truthfulness and the accuracy of each witness'[s] testimony and decide whether to believe all or part or none of that testimony. And you should consider the following factors as indicators as to whether or not testimony is believable:

Was the witness able to see, hear and know the things about which he or she testified; how well could the witness remember and describe the things they [sic] testified about; was the ability of the witness to see, hear, know, remember or describe these things [a]ffected by **youth** or old age or by a physical, mental or intellectual deficiency; did the witness testify in a convincing manner; how did they look, act, speak; did a witness have any interest in the outcome of the case; bias, prejudice or other motive that might [a]ffect their [sic] testimony; how well did the testimony of a particular witness compare with the other evidence in the case, including the testimony of other witnesses.

\* \* \*

While you are judging the credibility of each witness, you are likely to be judging the credibility of other witnesses or evidence. If there is a real irreconcilable conflict, it is up to you to decide which, if any, conflicting testimony or evidence to believe.

N.T., Jury Charge, 12/8/99, at 113–17 (emphasis added).

 Thus, the court's instructions to the jury, both before testimony began and at the close of all testimony, were absolutely clear: the jury—and the jury alone—was responsible for evaluating and deciding upon credibility of the witnesses. The court explicitly instructed the jury to consider whether the ability of a witness to see, hear, know, remember, or describe things was affected by, *inter alia,* youth. The jury is presumed to follow the court's instructions. *Common-*

*wealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1224 (2006). Appellant has provided not the slightest evidence that the jury did not do so in this case.

We recognize the importance of the children's testimony to the Commonwealth's case against Appellant. They were the only eyewitnesses to the murder, and the defense attempted to undermine the credibility of their testimony as inconsistent with Appellant's alibi. However, it must be noted that other evidence admitted at trial was consistent with the testimony of the children. Jennifer Pugh, the victim's sister, testified that Philip called her immediately after the murder, very anxious and excited, and said that "Steve" had shot his mother. N.T., 12/7/99, at 12.[10] Ms. Pugh then dialed 911 to report what her nephew had told her, and the 911 tape was played for the jury. N.T., 12/2/99, at 50–51; N.T., 12/3/99, at 122–24. Detective James Dougherty, who interviewed Desiree after the murder, testified that she named "Mr. Steve" as the man who shot her mother and identified Appellant from a photograph as "Mr. Steve." N.T., 12/3/99, at 151–53. Officer Etienne Starling, who brought Melvin Epps, the children's father and the victim's estranged husband, to the crime scene shortly after the murder, testified that the children ran to him and hugged him, and that Philip stated that "Mr. Steve" had shot his mother. *Id.* at 169, 172–73, 177–78.

Furthermore, and very importantly, the children were unwavering in their testimony that Appellant shot their mother after she had entered their apartment building and was waiting for an elevator. The children knew Appellant as their mother's boyfriend who had stayed at their residence on some occasions, and they identified him in court without hesitation. They also knew the type of car that Appellant drove. Their direct examination and cross-examination at trial were lengthy and detailed and revealed some minor inconsistencies. However, the essence of their testimony remained absolutely steadfast and unshakable—that Appellant, the man they knew

10. Ms. Pugh was initially called as a Commonwealth witness, but subsequently the defense also called her as a witness. This testimony was given during the Commonwealth's cross-examination of Ms. Pugh.

as "Mr. Steve," shot their mother. The following few excerpts of testimony illustrate the essence, and the consistency, of the children's testimony.

*Defense Counsel:* When your dad was with you with the police officers, there came a time when the police officers showed you a picture of Mr. Steve; is that correct?

*Desiree:* Yes.

*Defense Counsel:* They showed you one picture of Mr. Steve; right?

*Desiree:* Yes.

*Defense Counsel:* They didn't show you pictures of anybody else; right?

*Desiree:* No.

*Defense Counsel:* After they showed you the picture, your dad said that is Mr. Steve and you said that is Mr. Steve; right?

*Desiree:* No. I just said it was him.

*Defense Counsel:* You just said it was him?

*Desiree:* Yes.

N.T., 12/2/99, Cross-examination of Desiree, at 17–18.

*Prosecutor:* Who shot your mom?

*Desiree:* Mr. Steve.

\* \* \*

*Prosecutor:* Who was the man who caught the door, walked in the apartment building and shot your mom?

*Defense Counsel:* Objection; leading.

*Court:* Overruled.

*Prosecutor:* Who is the man?

*Desiree:* Mr. Steve.

*Prosecutor:* Have you seen him here today?

*Desiree:* Yes.

*Prosecutor:* Is this the guy?

*Desiree:* Yes.

*Id.,* Re-direct examination of Desiree, at 34–35.

*Prosecutor:* You talked to me before coming to court; right?

*Desiree:* Yes.

*Prosecutor:* You talked to your dad before coming to court, too; right?

*Desiree:* Yes.

*Prosecutor:* You talked to the police at sometime [sic]; right? The night that this happened, you talked to the police; is that correct?

*Desiree:* Yes.

*Prosecutor:* Now when you talked to the police the night that this happened, did you tell them the truth?

*Desiree:* Yes.

*Prosecutor:* You gave a statement to the police that night; right?

*Desiree:* Yes.

*Prosecutor:* You told the police that night in your statement that it was Mr. Steve who shot your mom, didn't you?

*Desiree:* Yes.

*Prosecutor:* Did anybody tell you to say that?

*Desiree:* No.

*Prosecutor:* Why did you say it?

*Desiree:* Because it is the truth.

*Prosecutor:* When you talked to me about this case, what did I tell you was the most important thing?

*Desiree:* To tell the truth.

*Id.* at 44–45.

*Defense Counsel:* Do you remember anything that [the prosecutor] asked you from the time that you met [him]? Do you remember anything that [he] said to you or asked you?

*Desiree:* He said to always tell the truth.

*Defense Counsel:* Anything else?

*Desiree:* I don't remember.

*Id.,* Re-cross examination of Desiree, at 47–48.

*Prosecutor:* Now you are in that door [to the apartment building] and where are you going?

*Philip:* To the elevator.

* * *

*Prosecutor:* Where was Mr. Steve then?

*Philip:* He was—he catch the door.

*Prosecutor:* He what?

*Philip:* He had caught the door, and then we had went into the apartment building. Then my mom had pressed the button. He shot her.

* * *

*Prosecutor:* What happened after he shot your mom, Philip?

*Philip:* He had ran out the door.

N.T., 12/2/99, Direct examination of Philip, at 59–60.

*Prosecutor:* Incidentally, the Mr. Steve who shot your mom that night, is he in the courtroom today?

*Philip:* Yes.

*Prosecutor:* Where is he, Philip?

*Philip:* Right there.

* * *

*Court:* Let the record indicate that Philip has identified [Appellant].

*Id.* at 66–67.

*Prosecutor:* Each one of those times when you were talked to by the police officers, when they first arrived on the scene before you talked to anyone, you said [Appellant] shot your momma; right?

*Philip:* Yes.

*Prosecutor:* When you talked to your aunt, who did you tell shot your mom?

*Philip:* Mr. Steve.

*Prosecutor:* When you talked to the police down at the station an hour and a half after you saw your mom killed, who did you say shot your mom?

*Philip:* Mr. Steve.

*Prosecutor:* Then in April, 1998, when you went to that preliminary hearing, you told the people at the preliminary hearing, the judge and the lawyers—and, by the way, I wasn't the lawyer then for the Commonwealth, was I?

*Philip:* No.

*Prosecutor:* It was some lady; right?

*Philip:* Yes.

*Prosecutor:* You told them all through there [Appellant] shot your mom?

*Philip:* Yes.

*Prosecutor:* Then when all those lawyers asked all those questions to you in February of 1999, you told them at least ten times that [Appellant] shot your mom, didn't you?

*Philip:* Yes.

*Prosecutor:* Did you ever tell anybody that [Appellant] didn't shoot your mom?

*Philip:* No.

*Prosecutor:* Why?

*Philip:* Because he did.

*Id.,* Re-direct examination of Philip, at 139–40.

The above excerpts present only some examples of the extensive testimony of the children, consistent in its essence despite lengthy and aggressive cross-examination, and corroborated by other evidence admitted at trial. Based on our review of the entire record, we cannot conclude that there is a reasonable probability that the outcome of Appellant's trial would have been different but for trial counsel's failure to object to the presence of the jury during the *voir dire* of the children, which consisted of brief questioning primarily regarding their schooling and their understanding of the distinction between truth and a lie. *See Commonwealth v. Dennis,* 597 Pa. 159, 950 A.2d 945, 954 (2008). Because Appellant has

not established prejudice, his claim of trial counsel ineffectiveness fails, and accordingly his derivative claim of appellate counsel ineffectiveness has no merit. Appellant is entitled to no relief on his second issue.[11]

### 3. Admission of Evidence of Prior "Bad Acts"

In Appellant's third issue, he alleges that trial counsel was ineffective for failing to object to the admission of evidence of several prior "bad acts," specifically, the following: [12] (a) testimony of the victim's sister that Appellant had assaulted the victim on a prior occasion and also had attempted to force himself on her sexually, N.T., 12/3/99, at 68, 118; (b) testimony

11. Appellant also briefly asserts that Detective Dougherty, who took the statement from Desiree concerning her mother's murder, and the prosecutor "vouched" for the testimony of Desiree and Philip, respectively. Detective Dougherty testified that, on the night of the murder, although Desiree seemed somewhat stunned by what she had seen, she was nonetheless able to answer questions about telling the truth. The detective concluded that he was comfortable with Desiree's understanding of the truth versus a lie. *See* Appellant's Brief at 48, 54–55 (quoting N.T., 12/3/99 at 151). Contrary to Appellant's assertion, Detective Dougherty did not offer his opinion as to the credibility of Desiree's testimony, but rather opined as to her demeanor and her ability to distinguish truth from a lie during his interview with her on the night of her mother's murder.

Appellant also asserts that the prosecutor effectively declared that Philip's testimony was truthful. The prosecutor asked Philip if he could distinguish between truth and a lie, and after the child responded, the prosecutor rephrased the child's answer, stating "That is pretty good. That is stated pretty good. The truth is telling about the thing the way it happened and a lie is telling something else—". *See* Appellant's Brief at 55 (quoting N.T., 12/2/99 at 54); *see also* text, *supra* (statement reproduced in context). Contrary to Appellant's assertions, the prosecutor did not state his opinion that the children's testimony was truthful. *See id.* at 48–49, 55. Rather, the prosecutor merely stated that Philip's attempt to state the difference between the truth and a lie was "pretty good."

We do not agree that these comments bolstered the children's testimony in the eyes of the jury. Furthermore, there is no reason to believe that these brief and passing comments resulted in prejudice to Appellant, such that the result of his trial would have been different had defense counsel objected. As we have explained in detail in the text, *supra*, despite lengthy and probing cross-examination, the children were unwavering in their testimony that Appellant shot their mother.

12. We have reordered Appellant's sub-issues for ease of disposition. *See* Appellant's Brief at 26–27.

of Officer Joseph Fischer that one of Appellant's former paramours had previously obtained a protection from abuse order against him, N.T., 12/6/99, at 198; (c) testimony of Officer Starling that Appellant had threatened to kill the victim's estranged husband, Melvin Epps, *id.* at 13–14, 21; (d) testimony from the victim's sister and from two of Appellant's paramours that Appellant had used various aliases, N.T., 12/3/99, at 129–31; N.T., 12/6/99, at 135, 177–80.

The issues underlying the ineffectiveness claims of sub-issues (a) and (b) have been previously litigated. On direct appeal, Appellant contended that the trial court had erred by allowing the victim's sister to testify that the victim said Appellant had struck her, the same testimony that is challenged here in sub-issue (a). Trial counsel *objected* to this testimony at trial, and thus the issue was preserved for review. *See* N.T., 12/3/99, at 61, 67–68; Appellant's Brief at 27–28 n. 13. Appellant raised the matter on direct appeal, but we declined to grant relief, holding that, *even if* the trial court had erred by admitting this testimony, any error was harmless given the "overwhelming evidence of Appellant's guilt" presented by the Commonwealth. *Hutchinson,* 811 A.2d at 560–61. Appellant does not provide any argument or legal support for his current assertion that direct appeal counsel raised the matter ineffectively, and accordingly this issue must fail.

Also on direct appeal, Appellant contended that trial counsel was ineffective for failing to object to the testimony of the victim's sister that the victim had said Appellant had tried to force himself on her, and to the testimony of Officer Fischer that one of Appellant's paramours had obtained a protection from abuse order against Appellant. *Id.* at 561; *see* sub-issues (a) and (b). We held that counsel was not ineffective for failing to object to this testimony, concluding that "both comments about which Appellant now complains were merely fleeting references made by [the] witnesses during cross-examination by defense counsel." *Hutchinson, supra* at 562. As such, "an objection by defense counsel might have served only to highlight the otherwise passing comments in the minds of the jurors." *Id.* We concluded further that

Appellant had failed to make any showing that he was preju-
diced by the failure of defense counsel to object to the
challenged testimony. *Id.* Thus, these sub-issues of trial
counsel ineffectiveness have been previously litigated. Appel-
lant's present general assertion that appellate counsel raised
trial counsel's ineffectiveness as to these sub-issues "ineffec-
tively," *see* Appellant's Brief at 36, is not developed in any
meaningful way and thus is not reviewable. Appellant de-
clines to state—much less develop—any specific aspects of
appellate counsel's performance that he finds problematic.
Mere failure to prevail on a claim on direct appeal does not
establish that appellate counsel was ineffective. Appellant is
entitled to no relief on these sub-issues.[13]

With regard to Appellant's sub-issues (c) and (d), we first
note that, of all the claims asserted by Appellant with regard
to these sub-issues, the only one cognizable is ineffective
assistance of appellate counsel grounded in trial counsel's
failure to object to the allegedly inadmissible testimony. Fur-
thermore, we are guided by the following well-established
principles with regard to the admissibility of evidence of prior
crimes or bad acts:

**13.** The dissent would reopen the questions of trial counsel ineffective-
ness raised in sub-issues (a) and (b), even though we resolved those
matters on the merits on direct appeal. *See* Saylor, J., dissenting
opinion at 359–61, 25 A.3d at 325. Based on Appellant's proffer that
appellate counsel engaged in no extra-record investigation, the dissent
appears to suggest the need for an evidentiary hearing as to whether
trial counsel had a reasonable basis for not objecting to the testimony
that he elicited during his cross-examination of the victim's sister and
Officer Fischer. We cannot agree.

As the dissent points out, in our resolution of this issue on direct
appeal, we suggested that an objection by trial counsel may have served
only to highlight the passing comments in the minds of the jurors.
However, we further concluded that "in light of the overwhelming
evidence of Appellant's guilt, Appellant has also failed to show a
reasonable probability that the outcome of the trial would have been
different had trial counsel objected to these two fleeting references."
*Hutchinson,* 811 A.2d at 562. We thus held that Appellant's claim of
trial counsel ineffectiveness "necessarily fails" due to an absence of a
showing of prejudice. *Id.* Given our holding on direct appeal as to the
lack of prejudice, we fail to see any rationale or need for an evidentiary
hearing.

While it is true that evidence of prior crimes and bad acts is generally inadmissible if offered for the sole purpose of demonstrating the defendant's bad character or criminal propensity, the same evidence may be admissible where relevant for another purpose. Examples of other such relevant purposes include showing the defendant's motive in committing the crime on trial, the absence of mistake or accident, a common scheme or design, or to establish identity.... the evidence may also be admitted where the acts were part of a chain or sequence of events that formed the history of the case and were part of its natural development. Of course, in addition to the relevance requirement, any ruling on the admissibility of evidence is subject to the probative value/prejudicial effect balancing that attends all evidentiary rulings.

*Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 419 (2008) (internal citations omitted); *see also* Pa.R.E. 404(b).

In sub-issue (c), Appellant asserts that the Commonwealth improperly elicited hearsay testimony from Officer Starling concerning Appellant's threat to kill the children's father and victim's estranged husband, Mr. Epps. Appellant's Brief at 27, 29. Appellant cites the Commonwealth's direct examination of Officer Starling concerning his investigation of the murder, wherein the officer testified that, shortly after the murder, he and his partner were driving to the Germantown Avenue address to which Appellant's Lexus was registered. However, while en route to that address, they changed directions and instead drove to Mr. Epp's home "because another call came over the radio that the children's father lived up in Mount Airy and that his person may be in danger." N.T., 12/3/99, at 163–64. Officer Starling further testified that when he and his partner reached the street where Mr. Epps lived, they surveyed the area to determine if Appellant's Lexus was there. *Id.* at 166–67. There was no other testimony suggesting the possibility of danger to Mr. Epps during direct examination.

However, during cross-examination, defense counsel repeatedly raised the matter in an attempt to suggest that the officers went to Mr. Epp's home, not because they feared he

was in danger, but because he was a suspect in the murder of his estranged wife. Relevant portions of Officer Starling's testimony in response to questioning by defense counsel are as follows:

*Defense Counsel:* You were going to that location [the address to which Appellant's Lexus was registered] to investigate; correct?

*Officer Starling:* Yes.

*Defense Counsel:* Then in the middle of going to that location, another flash information came over, okay, that the father of the children lived over at 8535 Williams Avenue; correct?

*Officer Starling:* Yes.

*Defense Counsel:* Now who made the decision, you, your brother officer or some other investigator, that changed you from going to Williams—I mean that changed you from going to the Germantown Avenue location to the Williams Street location? Why did you do that?

*Officer Starling:* Because we were in fear of the father's safety.

*Defense Counsel:* You were in fear of the father's safety?

*Officer Starling:* Yes.

*Defense Counsel:* What made you in fear of the father's safety at that point? What other information did you have?

*Officer Starling:* While on location, there was talk of threats against the father's life.

*Defense Counsel:* ... where did you get that information about threats to the father's life?

*Officer Starling:* I can't recall who told me that, but it was just amongst people talking on location.

*Defense Counsel:* Were they police officers or were they civilian people?

*Officer Starling:* It could have been both.

*Defense Counsel:* Now it is correct to say that no portion of your statement references this additional information about threats to the father when you were there; correct?

*Officer Starling:* Correct.

\* \* \*

*Defense Counsel:* In any event, that was why it was on your own initiative, as a result of having that information, that you changed locations from going to Germantown Avenue to Williams Street; right?

*Officer Starling:* Pretty much, yes.

*Defense Counsel:* Well, what am I missing? What else is there? What else went into the determination? You determined it; right?

*Officer Starling:* I wasn't driving, so it wasn't me, solely.

*Defense Counsel:* You weren't going there because the father might have been a suspect, were you?

*Officer Starling:* No.

*Defense Counsel:* Not at all; correct?

*Officer Starling:* I answered the question.

*Defense Counsel:* And I asked you a question. Not at all was he a suspect, in your mind?

*Officer Starling:* No.

*Defense Counsel:* Did you know that [ ] the husband of the woman who was shot had been estranged from her?

*Officer Starling:* No.

*Defense Counsel:* Did you receive that information?

*Officer Starling:* No.

*Defense Counsel:* Did you know that there was a bitter custody battle going on; did you hear any of that?

*Officer Starling:* No.

*Defense Counsel:* Did you hear anything about an equitable distribution or property division fight going on?

*Officer Starling:* No.

*Defense Counsel:* Nothing like that?

*Officer Starling:* No.

*Defense Counsel:* But, in any event, it is your testimony here today under oath that you went there because of fear, some fear or threats made to the father, but you don't know

where that came from other than civilian or police witnesses?

*Officer Starling:* That's correct.

* * *

*Defense Counsel:* Then it [the officer's statement] says Melvin Epps said Steve, who is the boyfriend, has another car, a white 1990 300 ZX, with a spoiler in the back, PA BDS–3982, registered to a Jeanette McPherson of 6753 Germantown Avenue. Melvin Epps told you all that?

*Officer Starling:* He told Officer Speller that.

*Defense Counsel:* So he had all that information at hand; right? Correct?

*Officer Starling:* I assume so.

*Defense Counsel:* Well, you were there. It says in your statement [that] Melvin Epps said—and he had all that information about Mr. Hutchinson and gave that right there when he was all upset; right?

*Officer Starling:* Yes.

*Defense Counsel:* Then, also, Mr. Epps also told us that Steve had threatened him in the past; right?

*Officer Starling:* Yes.

*Defense Counsel:* And that he was going to kill him, right?

*Officer Starling:* Yes.

N.T., 12/6/99, at 12–16, 21.

With the line of questioning quoted above, defense counsel was clearly trying to support his theory of the case, which he had also set forth in his opening statement, as follows:

What I believe the evidence will show is that there was arrested judgment here. That there was a failure to investigate fully. Because as [the prosecutor] said up front in this case, that there was a breakup between Stephanie Epps and Melvin Epps.... There was and it was an acrimonious split.... there was a dispute over property. There were allegations of abuse by Ms. Epps against Mr. Epps.... it's

[Appellant's] belief that Mr. Epps is behind the death of Stephanie Epps.

*　　　*　　　*

I believe [Mr. Epps] will say in a statement that [Appellant] threatened him and that he knew he was no good. Well, really what was going on, it was really the other way. The other way was that it was [Appellant] and members of Stephanie [Epps's] family had gone to Melvin[ Epps's] house to prevent some abuse in the early months prior to her death. And that it was [Appellant] who was there at times for Stephanie [Epps].

N.T., 12/1/99, Defense Counsel's Opening Statement, at 111, 113.

■■■■ As illustrated in the excerpts above, when considered in the appropriate context, Appellant's assertion that defense counsel was ineffective for failing to object to testimony regarding threats to Mr. Epps is revealed to have absolutely no merit. The Commonwealth's examination of Officer Starling concerning the investigative actions that police officers took shortly after responding to the scene of the murder elicited only very brief and general testimony regarding possible danger to Mr. Epps. Defense counsel—**not** the Commonwealth—elicited the acknowledgement from Officer Starling that Mr. Epps told police of Appellant's threats to kill Mr. Epps. *See* quoted notes of testimony from 12/6/99, *supra.* During cross-examination of Officer Starling, defense counsel tried repeatedly to suggest that police officers went to Mr. Epps's home immediately after the murder because he was a suspect. This line of questioning was entirely consistent with the narrative that defense counsel was attempting to develop at trial, *i.e.*, that Appellant had intervened to protect the victim from Mr. Epps, her abusive, estranged husband, who ultimately was responsible for her murder. By suggesting now that counsel was ineffective for failing to object to Officer Starling's testimony, Appellant implicitly calls into question trial counsel's overarching strategy and theory of the case.[14]

14. The dissent maintains that "Appellant's brief explicitly questions counsel's overarching strategy, along with the adequacy of the underly-

We will not conclude that counsel was ineffective merely because the jury did not find his narrative convincing or his strategy credible. Because trial counsel was not ineffective for failing to object to the testimony that **he** had elicited concerning Appellant's threats to Mr. Epps, Appellant's derivative claim of appellate counsel ineffectiveness for failing to raise the claim of trial counsel ineffectiveness must also fail.

 In sub-issue (d), Appellant asserts that trial counsel was ineffective for failing to object to the Commonwealth's introduction of evidence that Appellant used several aliases, i.e., Steven Marshall, Steven Boswell, and Fabian Hutchinson. Appellant's Brief at 27, 29–30. Appellant further argues that the evidence of Appellant's aliases "served no relevant purpose and was introduced solely to establish Appellant's bad character." Id. at 30. Contrary to Appellant's assertions, the evidence of Appellant's aliases served not just one but two highly relevant purposes at trial.

First, the Commonwealth presented evidence that the victim had sought a protection from abuse order against "Steven Marshall" shortly before her murder, and Appellant's aliases were introduced to establish that the victim knew Appellant by this name. See N.T., 12/3/99, at 127–29. Specifically, all three aliases were written in the victim's appointment book, which the Commonwealth introduced into evidence, and the victim's sister testified that when the victim first met Appellant, she said his name was "Steven Boswell." Id. at 130–31.

Second, evidence of Appellant's aliases was relevant to the Commonwealth's theory that Appellant had fled from Pennsylvania shortly after the murder. Shannon Husbands, another one of Appellant's paramours, testified that, on September 16,

ing guilt-phase investigation." Saylor, J., dissenting opinion at 360–61, 25 A.3d at 324 (citing Appellant's Brief at 72). However, the dissent's citation to Appellant's brief here is entirely out of context. The portion of Appellant's brief cited by the dissent addresses a different issue, specifically Issue 5, infra, in which Appellant alleges that counsel was ineffective for failing to investigate and present voluntary intoxication, diminished capacity, and heat of passion defenses. We discuss these allegations of ineffectiveness in the context in which they were made, i.e., under Issue 5.

1997, the day of the murder, she purchased a cell phone contract with Appellant, who used the name Steven Marshall for the transaction. N.T., 12/6/99, at 134–36, 147–48. Ms. Husbands, who knew Appellant by the names of Steven Boswick and Steven Marshall, as well as Steven Hutchinson, further testified that Appellant remained in possession of the newly purchased cell phone, despite her attempts to retrieve it from him. *Id.* at 135–38, 141, 149, 151–53. The Commonwealth then offered into evidence cell phone bills, which revealed that calls had been made on the cell phone from the Philadelphia area on September 16, 1997; then from the Richmond, Virginia, area on September 17 through 18, 1997; and then from the Miami, Florida, area, with the last call having been made on September 23, 1997. *Id.* at 158–63. Another of Appellant's paramours, Octavia Tucker, testified that she allowed police to put a trap and trace on her telephone, and that she had received phone calls from Appellant at times and from places that were consistent with the cell phone records discussed above. *Id.* at 173–76; *see also id.* at 185–86. Ms. Tucker further testified that she knew Appellant by the names Steven Marshall and Fabian Hutchinson, as well as Steven Hutchinson. *Id.* at 176–77. The testimony of Ms. Husbands and Ms. Tucker was highly relevant because it supported the Commonwealth's theory that Appellant fled from the Philadelphia area shortly after the murder.

Officer Joseph Fischer, a Philadelphia police officer, testified that he had been assigned to locate Appellant, under the names Steven Hutchinson or Fabian Hutchinson. *Id.* at 182–83. Officer Fischer further testified that, on January 1, 1998, more than three months after the murder, Appellant was apprehended in Las Vegas, Nevada. *Id.* at 183–84. Finally, the officer testified that Appellant gave his name as Steven Fabian Hutchinson for purposes of the biographical information report prepared by the police following Appellant's apprehension and transfer back to Philadelphia. *Id.* at 212–13.

Based on our review of the record, as summarized above, we conclude that there is no merit to Appellant's contention that his trial counsel was ineffective for failing to object to evidence

of Appellant's aliases. Preliminarily, we note that Appellant's mere usage of alternative names with his various paramours does not implicate him in criminal conduct. Nor does Appellant's intermittent usage of his middle name constitute a bad act.[15] Most importantly, and contrary to Appellant's assertions, his usage of aliases was highly relevant to the trial proceedings for two reasons. First, the victim had used one of Appellant's aliases in seeking a protection from abuse order shortly before her murder. Second, Appellant's usage of an alias tied him to the purchase of a cell phone, the records of which suggested his flight from Philadelphia to Florida shortly after the murder. Appellant fails to suggest any reasonable grounds on which defense counsel could have or should have objected to the introduction of evidence of Appellant's aliases. We conclude that there is no arguable merit to Appellant's assertions of error with regard to Appellant's aliases, and thus trial counsel was not ineffective for failing to object. Because trial counsel was not ineffective, Appellant's derivative claim of appellate counsel ineffectiveness for failing to raise the claim of trial counsel ineffectiveness must also fail.

Finally, Appellant contends that, even if the evidence of bad acts challenged in this issue was admitted for a discrete and limited purpose, trial counsel was ineffective for not requesting a limiting instruction to the jury as to its permissible use. This Court has held that when evidence of a defendant's prior criminal conduct or bad acts is admitted, the defendant is entitled upon request to a jury instruction explaining the limited purpose of such evidence. *Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 37 (2008) (citing *Commonwealth v. Billa*, 521 Pa. 168, 555 A.2d 835, 841–42 (1989)).

In *Billa*, we granted the appellant a new trial after concluding that his counsel was ineffective for failing to request a limiting instruction. The appellant had been found guilty of the first-degree murder of a sixteen-year-old girl with whom

15. Indeed, Appellant proffered as evidence to the PCRA court several of his medical records from Princess Margaret Hospital in the Bahamas, from 1985–1992, which bore the name Fabian Hutchinson. *See* Reproduced Record, Exhibit 18.

he had been attempting to establish a relationship. *Billa,* *supra* at 837. The trial court had admitted, over defense counsel's vigorous objection, testimony concerning a violent sexual assault on a different victim that had been committed by the appellant approximately two months before the murder. *Id.* at 838–39. The two attacks bore numerous similarities, including the fact that both victims were young Hispanic females. *Id.* at 841. Although we noted that the testimony of the sexual assault victim was vivid, graphic, highly prejudicial, and potentially emotional, we held that it was properly admitted because of its relevance to proving the appellant's motive and intent and the absence of accident. *Id.* Nonetheless, we also held that trial counsel was ineffective for failing to request an appropriate limiting instruction. *Id.* at 842. We recognized that the highly inflammatory testimony of the prior sexual assault victim "created the substantial danger that the jury could be swayed in its deliberations ... by this evidence showing [the] appellant's criminal character and his propensity to sexually assault young Hispanic females." *Id.* at 841. In addition, we recognized that the evidence in question was not merely a fleeting or vague reference to the appellant's criminal record, but rather was extensive as well as inflammatory, comprising a substantial component of the Commonwealth's case and garnering an emphasis in closing argument. *Id.* at 843. Accordingly, "[a]n appropriate limiting instruction ... would not have increased the jury's awareness of the prior sexual assault, but it well might have placed its limited legal significance in proper perspective." *Id.* at 843. We concluded that the *Billa* appellant's counsel was constitutionally ineffective for failing to request an appropriate limiting instruction as to the permissible use of evidence of the prior sexual assault, and we therefore awarded the appellant a new trial. *Id.* at 843.

In the instant case, the relevant circumstances have little, if anything, in common with those of *Billa,* and we decline to hold that trial counsel was ineffective for failing to request a limiting instruction. The bad acts evidence of which Appellant complains was not inflammatory, not graphic, and

not extensive. Some of the evidence was elicited as a single sentence in passing during cross-examination of the witnesses by defense counsel. In closing argument, the Commonwealth did make reference to Appellant's abuse of the victim, but did not mention the other bad acts. *See* N.T., Commonwealth Closing Argument, 12/8/99, at 107. Under these circumstances, an instruction as to the bad acts evidence may very well have served only to re-emphasize the evidence to the jury. More importantly, Appellant has not established prejudice, *i.e.*, he has failed to demonstrate that there is a reasonable probability that the outcome of his trial would have been different but for the lack of a limiting instruction. We have previously noted the "overwhelming evidence" of Appellant's guilt. *Hutchinson*, 811 A.2d at 562. In light of this overwhelming evidence, which includes eyewitness testimony of the victim's two children, both of whom knew Appellant, Appellant has failed to suggest how he could have been prejudiced by counsel's failure to request a limiting instruction such that there is a reasonable probability that the outcome of his trial would have been different. There is no merit to Appellant's claim of trial counsel ineffectiveness with regard to a limiting instruction, and therefore, the derivative claim of appellate counsel ineffectiveness also fails.

### 4. Prosecutorial Misconduct

Appellant's fourth issue is another claim of ineffective assistance of trial and appellate counsel, based this time on underlying claims of prosecutorial misconduct. In part A of this issue, Appellant focuses on the prosecutor's closing argument, which Appellant contends was inflammatory. In part B, Appellant focuses on evidence that was allegedly withheld in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We consider parts A and B in turn, mindful that the only allegation within either part cognizable under the PCRA is ineffective assistance of appellate counsel for not raising a claim of trial counsel ineffectiveness grounded in failure to object to the prosecutor's alleged misconduct. We consider here the underlying claims of prosecutorial mis-

conduct to determine if they satisfy the arguable merit prong of the *Pierce* test for ineffective assistance of trial counsel.

In accord with the long-standing principle that a "prosecutor must be free to present his or her arguments with logical force and vigor," this Court has permitted vigorous prosecutorial advocacy "as long as there is a reasonable basis in the record for the [prosecutor's] comments." *Common-wealth v. Robinson*, 581 Pa. 154, 864 A.2d 460, 516–17 (2004). Prosecutorial comments based on the evidence or reasonable inferences therefrom are not objectionable, nor are comments that merely constitute oratorical flair. *Tedford, supra* at 33. Furthermore, the prosecution must be permitted to respond to defense counsel's arguments. *Id.* Any challenged prosecutorial comment must not be viewed in isolation, but rather must be considered in the context in which it was offered. *Robinson, supra* at 517.

It is improper for a prosecutor to offer his or her personal opinion as to the guilt of the accused or the credibility of any testimony. *Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 112 (2004). However, it is well within the bounds of proper advocacy for the prosecutor to summarize the facts of the case and then to ask the jury to find the accused guilty based on those facts. *See id.*

The standard by which the court considers allegations of improper prosecutorial comments is a stringent one:

Comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict.

*Tedford, supra* at 33 (citation omitted).

In his first claim of prosecutorial misconduct during closing argument, Appellant asserts that the prosecutor sought to shift the burden of proof to Appellant, commented on Appellant's failure to testify, and suggested to the jury that Appellant had the burden to present corroborating evidence. Ap-

pellant's Brief at 40–41. Appellant's allegations are frivolous. Placed in proper context, the excerpt of the prosecutor's closing argument that Appellant challenges is the following:

Let's talk about credibility, and the judge is going to tell you that every case turns on credibility.... Credibility is just another way of saying believability.... Well, how do you determine whether or not you believe somebody just by looking at them? I mean, gee whiz, if you looked at Maureen Edwards [Appellant's alibi witness], and you had no other evidence in this case, you would say, gee, what a nice lady from maybe Toronto. Gee, I've got no other evidence in this case. She is believable. You've got no other evidence. Now wipe your mind of everything. She is believable. So one test is what? How the person looks, their demeanor, how they look. But do you stop there, because if you believe a person by just how they looked, and sometimes how they behaved, you would be where? Maybe where [the victim] is. No. You look at other things. You *look to see whether or not their testimony is corroborated, whether or not there is some other piece of evidence that says that, that corroborates their testimony,* and I can't go back to this too many times; the children say this guy shot their mom and he left in this doggone car. Well, who corroborates that? Eugene Green. [ ] What's he got to lie about? Did Mel[vin] Epps make him make that up? Did I make him make it up because he told the police that night first thing. So it is corroborated? Is it consistent? Is it consistent internally, the statement that is given or the testimony, and is it consistent externally. Do they say the same thing later on? Have these kids said anything but one thing? This guy shot my mom. No. But we were talking about Ms. Maureen Edwards. So you look at the other things. Who else would know what kind of car [Appellant] drove other than Octavia Tucker[?]. He lived with her. Edwards says what, he drove a Ford.... I said is it a Taurus? She said no, Explorer.... What do people testify to, at least Octavia Tucker, who had seen him up to recently[?] Never had one. Had a Taurus back in '96. The only

two cars [Appellant] drove are the two cars that we showed you. So credibility is just more than how the person looks. It is the stuff surrounding them.

N.T., 12/8/99, Prosecutor's Closing Argument, at 97–100 (emphasis added to the only portion of this paragraph that Appellant quotes in his brief; *see* Appellant's Brief at 41).

Contrary to Appellant's assertions, nothing in the prosecutor's comments remotely implied that Appellant bore the burden of proving his innocence or was required to present evidence corroborating his alibi witness. The prosecutor emphasized to the jury—correctly—that the testimony in this case was incontrovertibly and irreconcilably inconsistent. The victim's children testified that Appellant shot their mother, but Ms. Edwards testified that, at the time of the murder, Appellant was with her in another state. These stories were diametrically opposed, and the verdict depended on whom the jurors viewed as more credible. The prosecutor simply argued to the jury that other evidence presented in the case was relevant to this credibility determination, and he urged the jurors to consider all the evidence during their deliberations. Appellant's assertion that the prosecutor's arguments amounted to "a direct comment on Appellant's failure to testify," Appellant's Brief at 41, finds no basis in the prosecutor's actual words. The prosecutor's comments were not improper.

In Appellant's second and third claims of prosecutorial misconduct, he focuses on the following excerpt, close to the end of closing argument, in which the prosecutor developed the Commonwealth's theory of the case that Appellant's motive for murdering the victim was his inability to control her.

This is about control. Stephanie Epps . . . wanted to take control of her life. Who controls things, though? Who controls things? Who controls it? . . . How many people came in here and testified? Who controls it? Did Stephanie control it? She didn't control her life. *Who controlled people's lives?* Who had them buying cars to go with other women? Who lived with other women? *Who controlled those women? Who brings the women in here to lie?* Who has that control? Who wanted to break that control? This

is about Stephanie Epps wanting to free herself from psychological and physical abuse ... and she did get away from her husband. Maybe he did have an affair; that was the psychological abuse. She is away from him for a couple months and she hooks up with this guy, *who kicks the crap out of her.* How do we know that? How is that corroborated? Old bruises, new bruises, within 24 hours of her death. What does [the victim's sister] tell us? She called her sister on that Tuesday, [who] said [ ] do you believe he wanted to try to have sex with me last night? This was on Tuesday, the day she was killed, the day she writes ["]take control["]. It was no accident. I suggest to you this isn't even out of anger. This is out of wanting to dominate a woman.... But this is about total control. You don't do what I say, *I am not going to beat you anymore,* you are dead.

N.T., 12/8/99, Prosecutor's Closing Argument, at 106–08 (emphasis added to portions emphasized by Appellant; *see* Appellant's Brief at 40 and 42).

 Appellant asserts that in the above-quoted excerpt the prosecutor expressed his opinion that Appellant had pressured his alibi witness to lie for him. We disagree. Using a series of rhetorical questions based on the evidence presented, the prosecutor raised a logical and reasonable inference that Appellant had succeeded in his efforts to control the lives of his other paramours, including his alibi witness. There was no impropriety in the prosecutor's strategy or comments. *See Commonwealth v. Ragan,* 538 Pa. 2, 645 A.2d 811, 829 (1994) (declining to conclude that the prosecutor engaged in misconduct when he commented that the appellant's alibi defense had been fabricated because the comment was a fair inference based on evidence presented at trial and summarized by the prosecutor).

Finally, Appellant insists that this argument "was nothing more than a blatant attempt to inflame the jury and to ask the jury to draw the impermissible inference that Appellant had a propensity to kill.... because Appellant had beaten the decedent in the past, the jury should infer he killed her." Appellant's Brief at 40. Again, we disagree. The prosecutor briefly

summarized the evidence regarding Appellant's controlling and abusive relationship with the victim, and her desire to regain control of her life. From this evidence, the prosecutor drew a logical and reasonable inference as to Appellant's motive in killing the victim. The prosecutor did not suggest to the jury any groundless or improper inferences from the evidence, and Appellant's assertions to the contrary have no merit.

Because none of Appellant's assertions of prosecutorial misconduct during closing argument have the slightest merit, Appellant cannot satisfy the arguable merit prong of the *Pierce* test for ineffective assistance of trial counsel grounded in failure to object to the prosecutor's comments. Because trial counsel was not ineffective, Appellant's derivative claims of appellate counsel ineffectiveness also must fail.

In part B of issue four, Appellant contends that the prosecutor engaged in misconduct when he failed to provide certain evidence to the defense in violation of *Brady v. Maryland, supra.* The evidence in question is the following: (a) statements from the victim's sister and brother-in-law; (b) a police radio tape of 911 calls placed shortly after the murder; and (c) handwritten notes from a detective at the crime scene and the second page of a crime scene log. *See* Appellant's Brief at 46.

With regard to (a), statements from the victim's sister and brother-in-law, we must point out that neither Appellant nor the record provides any indication that such statements ever existed. The day before the beginning of jury selection, the prosecutor advised defense counsel that he might call the victim's sister and brother-in-law as witnesses. N.T., 11/23/99, at 61. The prosecutor explicitly stated that there were no statements from these witnesses. *Id.* at 61–62. Defense counsel then sought the prosecutor's notes from his discussions with the witnesses, but the court denied this request, holding that the notes were attorney work product and hence not discoverable. *Id.* at 62. Appellant does not challenge the veracity of this record, nor does he challenge the trial court's work product ruling, but he nonetheless alleges that the prosecutor acted in violation of *Brady* by failing to turn over

statements that apparently did not exist. *See* Appellant's Brief at 46. We need not address this claim any further.

Turning to sub-issues (b) and (c), trial counsel strenuously objected to the prosecutor's allegedly late proffer of the radio tape, the detective's notes, and the second page of the crime scene log. N.T., 12/2/99, at 36–39; N.T., 12/8/99, at 3–8. However, none of these alleged *Brady* violations was raised on direct appeal. Within these sub-issues, the only claim cognizable under the PCRA is ineffective assistance of appellate counsel for failing to raise a *Brady* claim with regard to the above evidence on direct appeal. Accordingly, we consider these sub-issues pursuant to the *Pierce* test for ineffective assistance, first determining if there is any arguable merit to Appellant's underlying claim of *Brady* violations.

 Under *Brady* and the decisional law it has spawned, a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature. *See, e.g., Commonwealth v. Lesko*, 15 A.3d 345, 370–71 (Pa.2011). Thus, to establish a *Brady* violation, an accused must prove three elements:

 the evidence [at issue] was favorable to the accused, either because it is exculpatory or because it impeaches; [2] the evidence was suppressed by the prosecution, either willfully or inadvertently; and [3] prejudice ensued.

*Commonwealth v. Lambert*, 584 Pa. 461, 884 A.2d 848, 854 (2005) (citation omitted).

 The evidence allegedly withheld must have been "**material** evidence that deprived the defendant of a fair trial." *Commonwealth v. Johnson*, 572 Pa. 283, 815 A.2d 563, 573 (2002). Favorable evidence is material, and constitutional error results from its suppression by the government "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Commonwealth v. Weiss*, 604 Pa. 573, 986 A.2d 808, 815 (2009) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). This Court

in *Weiss* discussed further how the materiality standard in essence defines the prejudice element of a *Brady* violation, as follows:

> In determining whether a reasonable probability of a different outcome has been demonstrated, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). A "reasonable probability" of a different result is shown when the government's suppression of evidence "undermines confidence in the outcome of the trial." *Bagley, supra* at 678, 105 S.Ct. 3375. The United States Supreme Court has made clear that *Bagley's* materiality standard is not a sufficiency of the evidence test. *Kyles, supra* at 434, 115 S.Ct. 1555. A *Brady* violation is established "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles, supra* at 435, 115 S.Ct. 1555. Importantly, "the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014, 1019 (2003) (emphasis added).

*Weiss, supra* at 815.

 Finally, the burden rests with an appellant to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution." *Commonwealth v. Porter,* 556 Pa. 301, 728 A.2d 890, 898 (1999).

 In the instant case, as outlined above, Appellant contends that the prosecutor withheld a police radio tape of 911 calls placed shortly after the murder, as well as a detective's notes from the crime scene and the second page of a crime scene log. *See* Appellant's Brief at 46. The 911 calls were made by the victim's daughter after she saw her mother

murdered and by the victim's sister after the children called her to tell her of the murder. Appellant fails to provide argument as to how the 911 tape satisfies the elements of a *Brady* violation. Specifically, Appellant fails to discuss how the 911 tape would have been favorable to him, either as exculpatory or impeachment evidence; in fact Appellant acknowledges that the 911 tape "bolster[s] the testimony of the juvenile eyewitnesses." *Id.* at 46–47. Furthermore, Appellant fails to suggest how he was prejudiced by his failure to receive the 911 tape in discovery. There is no arguable merit to Appellant's assertion of a *Brady* violation with regard to the 911 tape, and hence appellate counsel was not ineffective for failing to raise this issue on direct appeal.

Appellant's next *Brady* allegations concern the handwritten notes from a detective at the crime scene and the second page of a crime scene log. The documents in question were provided to defense counsel after the Commonwealth rested. *See* N.T., 12/8/99, at 3. Appellant contends that the detective's notes "identified two previously undisclosed witnesses to the shooting." Appellant's Brief at 46. However, this contention is not borne out by the record. The notes of testimony reveal that the "witnesses" identified in the detective's notes saw the victim's body when the elevator in which they were riding opened onto the floor where the shooting had just occurred; contrary to Appellant's assertion, there is no indication that they actually witnessed the shooting. *See* N.T., 12/8/99, at 5.[16] With regard to the second page of the crime scene log, Appellant points out that it "indicated that five shell casings had been recovered at the scene, not four as the Commonwealth's evidence had indicated." Appellant's Brief at 46. For none of this evidence does Appellant make any argument as to how or why it was favorable to him, how it could have been exculpatory, or how it could have been used to impeach any witness. Furthermore, Appellant makes no argument that the evidence was material and that he was

16. Officer Miles, who wrote the notes at issue was available to testify at trial, but the defense declined to call him. *See* N.T., 12/8/99, at 5, 9, 39–40.

prejudiced.[17] Following close review of the record, we conclude that there is no arguable merit to Appellant's assertion of a *Brady* violation with regard to any of this evidence, and hence appellate counsel was not ineffective for failing to raise the matters on direct appeal.

Because none of Appellant's underlying claims of prosecutorial misconduct has any merit, Appellant's fourth issue does not entitle him to any relief.

### 5. Alternative Defenses of Diminished Capacity and Heat of Passion

In Appellant's fifth issue, he alleges that trial counsel was ineffective for failing to investigate or to present several alternative defenses, specifically the defense of diminished capacity, due to mental defect or voluntary intoxication, and the defense of heat of passion; in addition, appellant alleges that appellate counsel was ineffective for failing to raise this claim of trial counsel ineffectiveness on direct appeal. The only claim in this issue cognizable under the PCRA is the derivative claim of appellate counsel ineffectiveness. Appellate counsel will not be held ineffective if trial counsel was not ineffective, and hence we begin by considering whether Appellant's allegations as to trial counsel ineffectiveness have any merit.

A defense of diminished capacity, whether grounded in mental defect or voluntary intoxication, is an extremely limited defense available only to those defendants who admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill. *Commonwealth v. C. Williams*, 602 Pa. 360, 980 A.2d 510, 527

17. We note that defense counsel called as a witness at trial the officer who prepared the crime scene log and extensively examined him. *See* N.T., 12/8/99, at 9–30. Appellant does not assert that this examination was in any way inadequate or ineffective.

In addition, as the Commonwealth points out, it was not entirely clear from the evidence presented at trial how many shots had been fired at the scene. *See* Commonwealth's Brief at 33. Desiree testified that more than one shot had been fired, although she did not remember how many; Philip testified that four or five shots had been fired. *See* N.T., 12/1/99, at 131, and N.T., 12/2/99, at 60, respectively.

(2009); *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1131 (2008); *Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1218 (2006) ("Absent an admission from [the defendant] that he had shot and killed [the victim], trial counsel could not have presented a diminished capacity defense.") [18] If a defendant does not admit that he killed the victim, but rather advances an innocence defense, then evidence on diminished capacity is inadmissible. *Commonwealth v. Laird*, 605 Pa. 137, 988 A.2d 618, 632 (2010).

 A diminished capacity defense "does not exculpate the defendant from criminal liability entirely, but instead negates the element of specific intent." *C. Williams, supra* at 527 (citing *Gibson, supra* at 1131). For a defendant who proves a diminished capacity defense, first-degree murder is mitigated to third-degree murder. *Commonwealth v. Saranchak*, 581 Pa. 490, 866 A.2d 292, 299 (2005). To establish a diminished capacity defense, a defendant must prove that his cognitive abilities of deliberation and premeditation were so compromised, by mental defect or voluntary intoxication, that he was unable to formulate the specific intent to kill. *Commonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215, 237 (2007); *Spotz, supra* at 1218. The mere fact of intoxication does not give rise to a diminished capacity defense. *Spotz, supra; Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645, 653 (2008) (requiring that a defendant show that he was "overwhelmed to the point of losing his faculties and sensibilities" to prove a voluntary intoxication defense). Evidence that the defendant lacked the ability to control his or her actions or acted impulsively is irrelevant to specific intent to kill, and thus is not admissible to support a diminished capacity defense. *Commonwealth v. Vandivner*, 599 Pa. 617, 962 A.2d 1170, 1183 (2009). Furthermore, diagnosis with a personality disorder does not suffice to establish diminished capacity. *Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 946 (2001).

**18.** *Spotz* was the opinion of a divided Court, but a majority of justices joined that portion of the opinion addressing the defense of diminished capacity. *See Spotz,* 896 A.2d at 1250 and 1251 (concurring opinions, Cappy, C.J. and Castille, J., respectively).

In numerous prior cases before this Court, defendants who had maintained their innocence during trial have subsequently raised post-conviction claims of ineffective assistance of trial counsel for failure to present and/or to investigate a defense of diminished capacity. We have consistently declined to hold that trial counsel was ineffective for failing to advance a defense that directly and irreconcilably conflicted with the accused's claims of innocence. *Rainey, supra* at 237 (declining to conclude that defense counsel was ineffective for failing to present a diminished capacity defense when the appellant was unwilling to admit that the shot the victim); *Spotz, supra* at 1217–19 (declining to conclude that trial counsel was ineffective for failing to present a diminished capacity defense based on mental defect or voluntary intoxication because it would have required the appellant to concede liability, which was inconsistent with his averments of innocence and his recapitulation of events to trial counsel); *Commonwealth v. R. Williams,* 577 Pa. 473, 846 A.2d 105, 112 (2004) ("[E]ven if counsel had thoroughly investigated [the appellant's] past, the presentation of a diminished capacity defense would have directly contradicted [the appellant's] assertions that someone else had committed the crime, and thus would not have been an available defense."). We have recently stated that "whether addressing a claim of counsel's failure to investigate or failure to present [a diminished capacity defense], this Court has employed the same analysis." *Gibson, supra* at 1132.

Finally, we have held that the authority to concede criminal liability and to authorize the presentation of a diminished capacity defense rests **solely** with the accused. *Commonwealth v. Weaver,* 500 Pa. 439, 457 A.2d 505, 506–07 (1983) (holding that even if diminished capacity was the only viable defense, trial counsel would be deemed ineffective for presenting this defense without the consent of the defendant).

 In the instant case, Appellant did not concede any liability in the killing of the victim. Rather, Appellant relied on an innocence defense, presenting an alibi witness, attempting to undermine the credibility of the child witnesses, and attempting to inculpate the victim's husband in her murder.

Under these circumstances, where Appellant did not admit killing the victim, but rather maintained his innocence, a diminished capacity defense was not available to him, pursuant to this Court's decisional law discussed *supra,* and trial counsel will not be held ineffective for failing to present an unavailable defense.

Nonetheless, Appellant further asserts that counsel was ineffective for failing to investigate diminished capacity defenses. To support this claim, Appellant has submitted an "Affidavit/Declaration" of his trial counsel, in which counsel asserts the following:

> [Appellant] advised me he was not present at the time of the murder and provided me with the name of an alibi witness. Based on these representations I did not investigate a diminished capacity, voluntary intoxication or heat of passion defense.

Affidavit/Declaration of Stephen P. Patrizio, Esq., pursuant to 28 U.S.C. § 1746, and 18 Pa.C.S. § 4904, at ¶ 7.[19]

Trial counsel prepared and presented the defense that Appellant sought based on his claim of non-involvement in the murder, his account of his whereabouts at the time of the murder, his naming of the alibi witness, and the testimony of the alibi witness. Appellant has offered absolutely no rationale as to why his counsel should not have accepted his claims of innocence and proffered the alibi witness, except to aver

19. We recognize that, based on this Court's precedent, counsel's "Affidavit/Declaration" is not properly characterized as an affidavit because the declarant did not swear to its truth before an officer authorized to administer oaths. *See Commonwealth v. Steele,* 599 Pa. 341, 961 A.2d 786, 823 (2008) (citing 1 Pa.C.S. § 1991 for the definition of affidavit); *Commonwealth v. Dennis,* 597 Pa. 159, 950 A.2d 945, 974 n. 27 (2008) ("[I]t appears that [an unsworn declaration] standing alone would be insufficient to establish the reasonable basis prong" of the test for ineffective assistance of counsel."); *Commonwealth v. Brown,* 582 Pa. 461, 872 A.2d 1139, 1148 n. 7 (2005) (citing 1 Pa.C.S. § 1991); *Commonwealth v. Hall,* 582 Pa. 526, 872 A.2d 1177, 1188 n. 10 (2005); *see also Brown, supra* at 1169–70, (Castille, J., concurring) ("Unwitnessed and unsworn non-affidavits ... are of considerably less value than sworn affidavits.").

However, Appellant has proffered this document as evidence, does not dispute any portion of its contents, and relies upon it for his argument. Appellant's Brief at 77.

that the alibi case was "weak." Appellant's Brief at 72. As we have made expressly clear, the authority to concede liability, which is an absolute prerequisite for a diminished capacity defense, rests solely and strictly with the accused. *Weaver, supra* at 506. Importantly, even at this stage in the proceedings, Appellant has not conceded any liability for the victim's murder. Appellant cannot succeed in his claim of trial counsel ineffectiveness for failing to investigate and pursue a diminished capacity defense when Appellant has not acknowledged an absolute prerequisite for that defense, *i.e.*, that he killed the victim. Regardless of trial counsel's investigative efforts, counsel had no authority to present a diminished capacity defense in the face of Appellant's assertions that he was completely innocent of the murder, assertions that remain unabated even now. *See R. Williams, supra* at 112. Therefore, we conclude that Appellant has failed to establish that trial counsel was ineffective for failing to present or to investigate a diminished capacity defense. Because trial counsel was not ineffective, Appellant's derivative claims of appellate counsel ineffectiveness must also fail.[20]

We turn next to Appellant's other claim in issue five, *i.e.*, that counsel was ineffective for failing to raise a heat of passion defense. A heat of passion defense, like the diminished capacity defense, is a partial defense, focused on the element of intent. *Commonwealth v. Laich*, 566 Pa. 19, 777 A.2d 1057, 1061 (2001); *Commonwealth v. Legg*, 551 Pa. 437, 711 A.2d 430, 432 n. 3 (1998). A defendant accused of murder may establish that he or she is guilty, not of murder, but rather of voluntary manslaughter, by proving that, at the

20. We must point out that Appellant's assertion that his case is "strikingly similar" to that of *Commonwealth v. Moore*, 569 Pa. 508, 805 A.2d 1212 (2002) (Opinion Announcing the Judgment of the Court), is erroneous. *See* Appellant's Brief at 75. In *Moore*, the appellant argued self-defense at his murder trial, but then asserted in his PCRA petition that trial counsel should have presented a diminished capacity defense. As we stated in *Moore*, "the theories of self-defense and diminished capacity are not mutually exclusive and could have been presented together." *Id.* at 1218. In contrast, Appellant here presented an innocence defense, which was irreconcilably incompatible with a diminished capacity defense. Accordingly, Appellant's attempt to rely on *Moore* is wholly unavailing.

time of the killing, he or she was acting under a sudden and intense passion resulting from serious provocation by the victim. *Commonwealth v. Miller,* 605 Pa. 1, 987 A.2d 638, 649 (2009); *Commonwealth v. Ragan,* 560 Pa. 106, 743 A.2d 390, 396 (1999) (citing 18 Pa.C.S. 2503(a)); *Commonwealth v. McCusker,* 448 Pa. 382, 292 A.2d 286, 288 & n. 4 (1972). Emotions encompassed by the term "passion" include "anger, rage, sudden resentment or terror which renders the mind incapable of reason." *Miller, supra* at 650. Whether the provocation by the victim was sufficient to support a heat of passion defense is determined by an objective test: whether a reasonable man who was confronted with the provoking events would become "impassioned to the extent that his mind was incapable of cool reflection." *Id.* (quoting *Commonwealth v. Thornton,* 494 Pa. 260, 431 A.2d 248, 252 (1981)). "To reduce an intentional blow, stroke, or wounding resulting in death to voluntary manslaughter, there must be sufficient cause of provocation and a state of rage or passion without time to cool, placing the [defendant] beyond the control of his reason, and suddenly impelling him to the deed. If any of these be wanting—if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder." *Id.* at 651 (quoting *Commonwealth v. Barnosky,* 436 Pa. 59, 258 A.2d 512, 515 (1969)).

 Appellant suggests no evidence that, at the time of the murder, he had been so provoked by the victim as to be compelled by passion beyond the control of his reason. The evidence cited by Appellant, *i.e.,* that Appellant and the victim had been arguing shortly before the murder, that there were serious problems in their relationship, that Appellant was jealous, and that Appellant's prior or concurrent paramours had sought restraining orders against him, does not show that, **at the time of the murder,** Appellant was uncontrollably compelled by passion or that the victim had provoked him into such passion.

Furthermore, Appellant provides no evidence or argument that trial counsel's strategy was unreasonable, except to aver

that his alibi defense was "weak." Appellant's Brief at 72. We cannot conclude that trial counsel was ineffective in seeking Appellant's acquittal with an alibi defense, based on the testimony of an alibi witness named by Appellant, as opposed to advancing a heat of passion partial defense strategy, for which there was no evidence. Because trial counsel was not ineffective, any derivative claim of appellate counsel ineffectiveness must likewise fail. Appellant's fifth issue does not entitle him to any relief.

### 6. Time Limitation on Closing Argument

In Appellant's sixth issue, he contends that the trial court improperly limited the time for trial counsel's closing argument, and that trial counsel and appellate counsel were ineffective for failing, respectively, to object and to raise this claim. Appellant's Brief at 62. Appellant alleges that the "trial court limited the guilt phase closing arguments to 20 to 30 minutes per side," a limitation that Appellant contends was "completely unreasonable and violated [his] rights to due process and a fair trial." *Id.* We must first note that the only claim cognizable under the PCRA in this issue is appellate counsel ineffectiveness for failing to raise on direct appeal a claim of trial counsel ineffectiveness for failing to object to the trial judge's limitation on closing argument. Because Appellant's derivative claim of appellate counsel ineffectiveness cannot succeed if trial counsel was not ineffective, we begin by considering Appellant's allegations against trial counsel.

In *Commonwealth v. Brown*, 544 Pa. 406, 676 A.2d 1178, 1185 (1996), this Court considered the issue of time limitation on closing argument and summarized the prevailing law on the matter as follows:

A defendant has a right to summation. The length of closing arguments is left to the discretion of the trial court. Unless there is such an unreasonable limitation of time that [it] effectively denies a defendant the right to summation[,] a criminal conviction should not be disturbed.

*Id.* (quotation marks and citations omitted).

The trial judge in *Brown* had interrupted defense counsel's closing argument to announce at a side-bar conference that

the court was limiting argument to forty-five minutes per side, and accordingly defense counsel only had fifteen minutes remaining for her closing argument. On direct appeal, the *Brown* appellant challenged the trial court's action, arguing that the time limitation prevented his counsel from presenting an argument that would enable the jury to concentrate on the issues. *Id.* Although we disapproved of the trial court's imposition of time limits **after** the closing arguments had begun, we declined to grant the appellant relief because our "review of defense counsel's argument indicate[d] that ample time was allowed to summarize the issues before the jury." *Id.*

Turning to the instant case, we note first that the trial judge here made clear to counsel **before the start of testimony** that she generally limited the time for closing arguments to thirty minutes. *See* N.T., 11/30/99, at 201. Furthermore, it is abundantly clear from the court's words that this was not an absolute rule, that it would not cut off an attorney who had something important to say, and that her general limitation was based on her experience as to a jury's attention span. Specifically, the trial judge's comment concerning closing argument, made to the prosecutor and defense counsel the day before testimony commenced, was the following:

Closings, I generally limit to about a half hour. So just think about that now in terms of your closings. I mean I have never stopped someone who had something important to say, but I tell you to hone in on what's important because the jury doesn't have an attention span that is longer than 15, 20 minutes. So I tell you now with the proviso if there is something you have to deal with, I very rarely have ever cut off an attorney, okay.

*Id.*

During defense counsel's closing argument, after counsel had spoken for thirty minutes, the court did interrupt him as follows:

*Court:* [Counsel], are you going to be wrapping up shortly?

*Defense Counsel:* That is a half hour already?

*Court:* Yes.

*Defense Counsel:* I will try to do it, your honor.

N.T., 12/8/99, at 88. Defense counsel continued his argument for a short time and then ended.[21]

Based on these excerpts from the notes of testimony, we conclude that Appellant's contention that the trial court limited the guilt phase closing arguments to 20 to 30 minutes per side does not truly reflect the trial judge's position, actions, or words. Notably, the trial judge did **not** cut short defense counsel's closing argument, but rather, after counsel had addressed the jury for thirty minutes, asked if counsel was going to be ending shortly. If counsel still had something important to say, there is no indication from the record that he could not have continued, relying on the court's instructions issued before any testimony started. We fail to see on what basis trial counsel could or should have objected to the court's actions.

Nonetheless, Appellant insists that defense counsel was unable to include a number of matters in his closing argument because of time limitations imposed by the trial judge, and that counsel was ineffective when he did not seek more time to include these matters. Appellant's Brief at 64–66. We have considered each of these matters in light of the entire record, and conclude that there is no arguable merit to Appellant's claims.

First, Appellant contends that defense counsel was unable to argue that the testimony of the victim's children had been improperly influenced by Mr. Epps, their father, and by the prosecutor. Appellant's contention disregards or ignores many of the arguments that defense counsel **did** make during closing argument. Specifically, defense counsel argued that the children truly believed that Appellant had killed their

**21.** Defense counsel's closing argument took up 24 pages total of the notes of testimony, and the court interrupted him on page 22. *See* N.T., 12/8/99, at 66–90.

mother and thus were not really lying; that the children knew all the answers to the prosecutor's questions, but could not answer most of defense counsel's questions; that there were many inconsistencies in the children's testimony; that, for a very short time after the murder, Mr. Epps was a suspect in the victim's murder, and Mr. Epps gained the most from the victim's death because of the ongoing divorce and custody actions; that "somebody else" may have influenced one of Philip's statements, made in the context of comments centered around his father; that Desiree's testimony may have been "tainted"; and that there was a "program" as to Philip's testimony. *See* N.T., 12/8/99, at 75–76, 80, 83, 85–87. The clear implication from defense counsel's comments was that the prosecutor had improperly coached the children prior to their testimony, and that Mr. Epps had a strong interest in deflecting blame for the victim's death from himself to Appellant and did so by influencing his children's testimony. Defense counsel's theory that Mr. Epps had influenced the children's identification of Appellant as the man who shot their mother was weakened by testimony of the victim's sister. She testified that the children called her immediately after the murder and told her that Appellant had shot their mother; a 911 tape, played for the jury, was consistent with the aunt's testimony. *See* N.T., 12/2/99, at 50–51; N.T., 12/3/99, at 122–24. The children's call took place prior to the reuniting of the children with Mr. Epps. Defense counsel sought during his closing argument to cast doubt on the significance of the aunt's testimony, as it was incompatible with his theory as to the genesis of the children's testimony. *See* N.T., 12/8/99, at 76–77. Given all of defense counsel's statements and arguments summarized above, there is absolutely no merit to Appellant's contention that counsel needed yet more time to make yet more argument concerning the influence of Mr. Epps and the prosecutor on the children.

Second, Appellant contends that defense counsel was unable to argue certain details about the Commonwealth's alleged inadequate investigation and presentation of physical evidence. In particular, Appellant claims he had to omit argument

concerning the following: a partial footprint from the crime scene; testimony that five shell casings were found at the crime scene; and testimony that only three of the four bullets recovered from the crime scene were conclusively determined to have been fired from the same firearm.[22] In closing argument, defense counsel repeatedly stated that the instant case had been marked by a "rush to judgment" and "failure to investigate" on the part of the Commonwealth. N.T., 12/8/99, at 70, 71, 77, 81, 86, 88. Counsel mentioned the five shell casings twice and mentioned the ballistics evidence of the bullets once, as alleged examples of the failure to investigate. *See* N.T., 12/8/99, at 82–83. Appellant does not suggest what more points needed to be argued, but were not because of time limitations, with regard to the shell casings, the ballistics evidence, or the partial footprint. There is no merit to Appellant's allegations that counsel needed more time.

Third and finally, Appellant contends that defense counsel lacked the time to include in his closing argument the issue of specific intent. More specifically, Appellant relies on testimony of the medical examiner who found no stippling of the victim's gun-shot wounds, indicating that she was not shot at close range.[23] N.T., 12/6/99, at 83–84. Appellant insists that counsel had inadequate time to develop the significance of this finding for the issue of specific intent of the shooter. *See* Appellant's Brief at 66.

Appellant's argument is frivolous. Defense counsel's closing argument reflected—appropriately—his theory of the case, as developed throughout trial, *i.e.*, that Appellant could not have killed the victim because he was in another state, but the

**22.** The actual testimony as to the ballistics evidence was that three of the four bullets recovered could be definitively matched to a single weapon. One bullet could not be definitively matched to that same weapon, but the evidence could not rule out the possibility that all four bullets had come from the same weapon. N.T., 12/6/99, at 11.

The matter of the five shell casings was discussed in the text, *supra,* under issue 4, alleged *Brady* violations.

**23.** The meaning of "close range" in this context is derived from the medical examiner's testimony: The lack of stippling around the victim's wounds indicated that she had been shot from a distance of at least two or three feet. N.T., 12/6/99, at 83–84.

victim's estranged husband, who had ample motive for the murder, sought to place the blame on Appellant. Consistent with this theory, defense counsel proffered an alibi witness; strongly challenged the credibility of the testimony of the victim's children and sister; and questioned the investigation of the police officers at the scene, including their motivation for going to Mr. Epp's home after the murder. All of this evidence was summarized in defense counsel's closing argument. Counsel's individual arguments and his overall strategy would have been undermined and the jury confused had counsel appended to his closing an aside that the shooter must not have acted with intent to kill, because the shots were not fired at close range. There is no merit to Appellant's allegation that time limitations prevented trial counsel from arguing the significance of the medical examiner's testimony as to the issue of specific intent. Certainly, counsel did not argue specific intent—but the reasons for not doing so had nothing to do with time limitations.

■ In sum, our review of the record, as discussed above, reveals that there is no merit to Appellant's contention that trial counsel was ineffective for failing to object to the trial court's time limitation on closing argument. Because trial counsel was not ineffective, the derivative claim of appellate counsel ineffectiveness for not raising the issue of trial counsel ineffectiveness on direct appeal also is meritless. Appellant's sixth claim fails.

## 7. Cumulative Errors

■ In Appellant's seventh issue, he contends that cumulative errors denied him due process. In its entirety, this claim comprises three sentences, no citations to authority or to the record, no specifics, and no argument. It is impossible to determine exactly what Appellant is alleging, and thus the claim is unreviewable. "[W]here a claimant has failed to prove prejudice as the result of any individual errors, he cannot prevail on a cumulative effect claim unless he demonstrates how the particular cumulation requires a different analysis." *Commonwealth v. Wright*, 599 Pa. 270, 961 A.2d

119, 158 (2008); *see also Commonwealth v. Small*, 602 Pa. 425, 980 A.2d 549, 579 (2009) (concluding that a broad and vague claim of the prejudicial effect of cumulative errors did not entitle the appellant to relief). Although cumulative prejudice from individual claims may be properly assessed in the aggregate when the individual claims have failed due to lack of prejudice, nothing in our precedent relieves an appellant who claims cumulative prejudice from setting forth a specific, reasoned, and legally and factually supported argument for the claim. *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532 (2009) (citing *Commonwealth v. Perry*, 537 Pa. 385, 644 A.2d 705, 709 (1994) for the principle that a new trial may be awarded due to cumulative prejudice accrued through multiple instances of trial counsel's ineffective representation); *Commonwealth v. Sattazahn*, 597 Pa. 648, 952 A.2d 640, 671 (2008). A bald averment of cumulative prejudice does not constitute a claim. Appellant's seventh issue entitles him to no relief.

### 8. PCRA Court Recusal

In Appellant's eighth issue, he claims that the PCRA court erred by denying his motion for recusal. The same judge presided at Appellant's trial and over the post-conviction proceedings. Appellant alleges that the remarks of the court during a pre-trial suppression hearing indicated a bias in favor of the Commonwealth and a pre-judgment against Appellant, necessitating recusal from the post-conviction proceedings. Appellant's Brief at 77–78.

A party that seeks recusal of a judge bears the burden "to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." *Commonwealth v. Abu–Jamal*, 553 Pa. 485, 720 A.2d 79, 89 (1998). This Court reviews a jurist's denial of a motion to recuse for abuse of discretion. *Id.* In addition, we have concluded that, in general, it is preferable for the judge who presided at trial to preside over any post-conviction proceedings because his or her familiarity

with the case will likely assist the proper administration of justice. *Id.* at 90.

Appellant based his motion to recuse on some statements made by the trial court during a pre-trial suppression hearing, following which the court denied Appellant's motion to suppress the in-court identification of Appellant by Philip and Desiree, the juvenile witnesses. *See* N.T. Suppression Hearing, 11/24/99, at 47. Specifically, Appellant cites the following:

*Court:* The bottom line in my courtroom is if you've got the evidence to convict someone, I want the conviction to stick.

*Prosecutor:* Me too, Judge.

*Court:* If you don't, you don't, but if you do have it, let's do it in a way that there can't be any PCRA's down the lane.... I say that because[,] not that I have any preconceived ideas about the case or about your client, but I just want to make sure that if we can eliminate an appellate issue, we do so.

N.T. Suppression Hearing, 11/24/99, at 5–6.

Appellant argues that these comments show that the trial court had pre-judged the case, and accordingly the court's "clear motive was to create an aura of a superficial due process, while ensuring that [Appellant] was convicted." Appellant's Brief at 80. Appellant is mistaken—the quoted comments show nothing of the kind. The court stated that it had **not** pre-judged the Commonwealth's evidence, and simply wanted to avoid any error that might lead to reversal on appeal if there was a conviction. No unfairness or desire to subvert due process was remotely implied by the court's comments.

Appellant also claims bias in the trial court's allegedly solicitous treatment of Philip, the victim's twelve-year-old son. Appellant is again mistaken. Recognizing the young age of the child, the court was attempting to ensure that, if Philip was called as a witness at the suppression hearing, it was done in the "least traumatic" way the court could think of. N.T. Suppression Hearing, 11/24/99, at 5–6. When the prosecutor stated that he would prefer not to put the victim's children on

the stand at the suppression hearing, the court assured him that he was free to call whichever witness he wanted to establish that the children had an independent basis for their identification of Appellant. *Id.* at 4. When defense counsel indicated that he might call Philip as a witness, the court merely suggested to the prosecutor that he might want to prepare the child for such a possibility. *Id.* at 5. The court also stated that it would allow the child's grandmother to sit with him in the jury box "so he can be comfortable" while he testified. *Id.* at 6. Contrary to Appellant's assertions, nothing in the court's words or actions suggested bias against Appellant or pre-judgment of his guilt. The court's recognition that a twelve-year-old child is not an adult and the court's desire to spare him unnecessary trauma during his testimony do not imply bias or prejudice against Appellant.

Appellant's assertion of error in the PCRA court's denial of his motion to recuse is entirely lacking in merit and provides no basis for relief.

### 9. PCRA Evidentiary Hearing

In Appellant's ninth issue, he contends that he was entitled to an evidentiary hearing regarding the "substantial claims under the United States Constitution and the Pennsylvania Constitution" raised in his petition. Appellant's Brief at 83–84. Appellant cites Pennsylvania Rule of Criminal Procedure 908(A), which provides that a judge shall order a hearing when a petition for post-conviction relief raises material issues of fact. However, Appellant does not apply the rule to his case and he does not specify within this vague and general claim a single material fact that in his view was raised by his petition and warrants a hearing. Our review of each of Appellant's claims, *see* text, *supra,* reveals that the PCRA court did not abuse its discretion in denying Appellant's petition without a hearing. *See Commonwealth v. Rush,* 576 Pa. 3, 838 A.2d 651, 659–60 (2003) (holding that a PCRA court did not abuse its discretion in denying a petitioner's claim without a hearing when the merits of the claim "could be adequately reviewed based upon the record and it [was]

unclear what purpose an evidentiary hearing would have served"). Appellant's non-specific assertions of PCRA court error for failure to hold a hearing do not entitle him to relief.

## 10. Notice of Intent to Dismiss

In Appellant's tenth and final issue, he contends that the PCRA court violated Pennsylvania Rule of Criminal Procedure 907 and 909 when the court did not provide notice that it was dismissing Appellant's guilt phase claims without an evidentiary hearing.

Rule 907 provides in relevant part as follows:

Except as provided in Rule 909 for death penalty cases, (1) the judge shall promptly review the petition, any answer by the attorney for the Commonwealth, and other matters of record relating to the defendant's claim(s). If the judge is satisfied from this review that there are no genuine issues concerning any material fact and that the defendant is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings, the judge shall give notice to the parties of the intention to dismiss the petition and shall state in the notice the reasons for the dismissal. The defendant may respond to the proposed dismissal within 20 days of the date of the notice.

Pa.R.Crim.P. 907(1).

Similarly, Rule 909 provides in relevant part as follows:

**(B) Hearing; Disposition**

(1) No more than 20 days after the Commonwealth files an answer pursuant to Rule 906(E)(1) or (E)(2), or if no answer is filed as permitted in Rule 906(E)(2), within 20 days after the expiration of the time for answering, the judge shall review the petition, the Commonwealth's answer, if any, and other matters of record relating to the defendant's claim(s), and shall determine whether an evidentiary hearing is required.

(2) If the judge is satisfied from this review that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and

no legitimate purpose would be served by any further proceedings,

 (a) the judge shall give notice to the parties of the intention to dismiss the petition and shall state in the notice the reasons for the dismissal.

 (b) The defendant may respond to the proposed dismissal within 20 days of the date of the notice.

Pa.R.Crim.P. 909(B).

 We have previously made clear that the intent behind these rules is to ensure that an evidentiary hearing is held when a PCRA petition raises factual issues that must be resolved. *Commonwealth v. Banks*, 540 Pa. 143, 656 A.2d 467, 473 (1995). "[N]otice of a court's intention to dismiss is required only where the trial court, after review of the petition, any answer by the Commonwealth thereto, and any other matters of record, determines that a hearing is not necessary, that the petitioner is not entitled to post-conviction relief, *and that no further proceedings are necessary.*" *Id.* (emphasis in original). In *Commonwealth v. Lark*, 548 Pa. 441, 698 A.2d 43, 52 (1997), we concluded that no pre-dismissal notice was required pursuant to Rule 907(a) because the court had heard oral argument on the matter of whether an evidentiary hearing was required prior to determining that there were no factual matters to be resolved.[24]

 Based on our holdings in *Banks* and *Lark*, we conclude that the PCRA court did not violate Rules 907 or 909 by failing to provide Appellant with formal written notice of intent to dismiss his guilt-phase claims. A brief procedural history of Appellant's case will suffice to explain this conclusion. Appellant filed a *pro se* PCRA petition on January 13, 2004. The PCRA court appointed counsel, who filed an amended PCRA petition on January 28, 2005. The Commonwealth filed a motion to dismiss on June 2, 2005, to which Appellant filed a reply on December 20, 2005. On February 21, 2006, the PCRA court held a hearing, at which time defense counsel correctly asserted that, under prevailing law,

**24.** Rule 907 was, prior to April 1, 2001, numbered Rule 1507.

an evidentiary PCRA hearing is required when there is an outstanding issue of material fact. N.T., 2/21/06, PCRA Hearing, at 3. Defense counsel then argued that a hearing was required for many of Appellant's guilt phase as well as penalty phase claims. After hearing the arguments of defense counsel and then the Commonwealth, the court made clear its conclusion that there was no need for an evidentiary hearing as to the guilt phase claims. *Id.* at 46–47. However, the court did grant an evidentiary hearing as to Appellant's claims of ineffective assistance of counsel during the penalty phase. *Id.* at 46–47. Appellant had ample notice and ample opportunity to set forth the material facts that, in his view, remained at issue and accordingly justified an evidentiary hearing. Accordingly, we hold that there was no violation of Rules 907(1) or 909(B), and Appellant is entitled to no relief on his tenth and final issue.

In sum, after review of each of Appellant's guilt phase issues, we conclude that none has any merit, and therefore we affirm the order of the PCRA court denying Appellant guilt phase relief.

Chief Justice CASTILLE, Justices EAKIN, BAER, ORIE MELVIN, join the opinion.

Justice TODD concurs in the result.

Justice SAYLOR files a dissenting opinion.

Justice SAYLOR, dissenting.

Respectfully, I have material differences with the majority reasoning and dissent in favor of an evidentiary hearing.

Initially, concerning the state of this Court's "layering" jurisprudence in general, I have set down some of my own thoughts in *Commonwealth v. Ly*, 605 Pa. 261, 989 A.2d 2 (2010) (*per curiam*), which I incorporate here by reference. *See id.* at 262–65, 989 A.2d at 2–5 (Saylor, J., dissenting). The concerns raised in *Ly* are magnified, in the capital arena, due to the involvement of the former relaxed waiver doctrine and its potential impact on the decisions of trial and appellate lawyers in capital litigation throughout the period in which the

doctrine remained extant.[1] *See generally* Maura Caffrey, *Untying the Knot: A Solution for Confusion in Federal Habeas Review of Pennsylvania State Court Capital Convictions*, 11 U. PA. J. CONST. L. 985 (2009).

I remain convinced that these difficulties cannot be effectively mitigated until this Court addresses the due process concerns being raised regarding both the application of the *Hubbard* rule in light of time-and-resources constraints connected with direct appeals, *see Ly*, 605 Pa. at 262–65, 989 A.2d at 2–5 (Saylor, J., dissenting), and the retroactive abolition of relaxed waiver. *See Commonwealth v. Steele*, 599 Pa. 341, 429 n. 3, 961 A.2d 786, 839 n. 3 (2008) (Saylor, J., dissenting). Notably, the present case is yet another in which it is asserted that direct-appeal counsel understood that his duties did not encompass investigation and presentation of extra-record claims. *See* Declaration of James J. McHugh, Jr. (Feb. 17, 2006) (relating contents from an interview with Appellant's direct-appeal counsel).

Second, the majority approves the admission of a detective's opinion of a child witness's "ability to distinguish truth from a lie" during an interview. Majority Opinion, at 319 n. 11, 25 A.3d at 299 n. 11. While I agree the detective could testify to his observations of the child's demeanor, I fail to see how a law enforcement officer's opinion as to her extrajudicial truth-telling ability would not bolster the Commonwealth's position concerning such capability in the courtroom. Moreover, the admission of such an opinion seems to me to be in tension with the prevailing law limiting juror involvement in determining competency to testify, *see id.* at 289–91, as well as the decisions reserving the subject of witness veracity to the jury. *See, e.g., Commonwealth v. Balodis*, 560 Pa. 567, 576, 747 A.2d 341, 345 (2000) (explaining that this Court has "reject[ed] the need for expert testimony on the question of a witness' veracity").[2] Contrary to the majority position, *see* Majority

1. Appellant discusses a due process concern associated with the relaxed waiver doctrine, which applied at the time of his direct appeal, *see* Brief for Appellant at 9–10, albeit this is not addressed by the majority.

2. While the detective was not qualified as an expert, it seems reasonable to assume that a lay juror might believe that such a law enforcement officer would acquire special experience in evaluating truth telling.

Opinion, at 319 n. 11, 25 A.3d at 299 n. 11, I also believe the prosecutor's affirmations of the other child witness's answers to the *voir-dire*-type questions—which were improper in the first instance under prevailing law, *see id.* at 310–11, 25 A.3d at 295—represented objectionable bolstering. Indeed, it is difficult to envision a more straightforward example of bolstering than affirming a witness's response as "pretty good."[3]

Next, I have difficulty with the characterization of testimony that Appellant attempted to force himself upon the victim in the days prior to the killing, and that a protection-from-abuse order was secured against Appellant by another woman, as "fleeting." *Id.* at 320–21, 25 A.3d at 299. While I realize this term was used in the direct appeal, Appellant's brief at that stage did not mention the prosecutor's forceful reference to these events in his closing argument. *See id.* at 334–35, 25 A.3d at 308–09 (quoting the relevant remarks of the district attorney). Moreover, although this extra-record claim was presented on direct appeal, Appellant has proffered that direct-appeal counsel nonetheless engaged in no extra-record investigation. *See* McHugh Dec. at 1–2. Thus, it would appear that direct-appeal counsel may be among a substantial number of appellate attorneys who did not appropriately represent their capital clients on direct appeal. *See Ly,* 605 Pa. at 263–65, 989 A.2d at 3–4 (Saylor, J., dissenting) (discussing the controversy surrounding the *Hubbard* rule that extra-record claims had to be raised on direct appeal on pain of waiver).[4] Particularly in light of the potent argument advanced by the prosecutor, it seems unlikely to me that the jurors, in a first-degree murder prosecution advancing a domination theory of motive, would have overlooked an attempted sexual assault of the victim and a restraining order involving another woman. Moreover, and again, we do not have counsel's explanation for why he did not object, and in this void, the majority's attribution of a reason for such omission (see

3. The prosecutor's encouraging approach to the questioning of this child-witness is consistent with the manner in which many adults conduct discussions with young children. The difficulty is that, in the courtroom, there is the potential for a collateral bolstering effect.

4. Only one other issue was pursued on direct appeal.

Majority Opinion, at 320–21, 25 A.3d at 299–300) appears to me to represent extra-record gleaning of motivations and strategies, a practice this Court has previously eschewed. *See, e.g., Commonwealth v. Duffey,* 579 Pa. 186, 205, 855 A.2d 764, 775 (2004) (directing that "only when the record clearly establishes that the act or omission of trial counsel was without a reasonable basis should the court resolve the reasonable basis prong absent a remand for an evidentiary hearing as to counsel's strategy") (citing *Commonwealth v. McGill,* 574 Pa. 574, 588, 832 A.2d 1014, 1022 (2003)).[5]

Next, in rejecting Appellant's claim of ineffectiveness connected with the introduction of other-bad-acts evidence, the majority indicates that Appellant "implicitly calls into question trial counsel's overarching strategy and theory of the case." Majority Opinion, at 326, 25 A.3d at 303. In fact, Appellant's brief explicitly questions counsel's overarching strategy, along with the adequacy of the underlying guilt-phase investigation. For example, Appellant argues:

> On its face, the guilt phase case against Appellant was substantial. It consisted of two eye-witnesses, that knew Appellant, who testified they clearly saw Appellant shoot the decedent. The Commonwealth also presented evidence of Appellant's flight immediately after the shooting. The Commonwealth also presented extensive evidence of domestic discord between Appellant and the decedent—in the form of verbal and physical fights—starting at least a week before the shooting and continuing literally up to the moment before the fatal shots were fired. Clearly counsel should have at least considered the fact that the issue for

---

5. I realize that a recent decision of the United States Supreme Court appears to suggest that extra-record gleaning is appropriate for purposes of federal habeas corpus review. *See Cullen v. Pinholster,* —— U.S. ——, ——, 131 S.Ct. 1388, 1404–06, 179 L.Ed.2d 557 (2011). There are material differences, however, between state post-conviction and federal habeas review, *see generally Commonwealth v. Beasley,* 600 Pa. 458, 483–85, 967 A.2d 376, 391–92 (2009), and it is unclear whether (and/or to what degree) the *Pinholster* decision will bear relevance to this Court's disapproval of gleaning. At the very least, this Court's own approach—deriving from the compromise decision in *McGill*—was intended to provide more concrete footing for addressing trial strategies to mitigate differences among members of the Court for purposes of primary-level, state post-conviction review.

the jury in this case was not going to be who did it, but rather what was the state of mind of the shooter before he presented a weak alibi case.

Brief for Appellant at 72.[6]

Despite such allegations, the extent of counsel's guilt-phase investigation and preparation remains undeveloped, because the PCRA court refused to conduct an evidentiary hearing.[7] While the majority correctly indicates that the Court "will not conclude that counsel was ineffective merely because the jury did not find his narrative convincing or his strategy credible," Majority Opinion, at 326, 25 A.3d at 303–04, here, deficient investigation and preparation are alleged. *See generally Strickland v. Washington*, 466 U.S. 668, 690–91, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984) (explaining that a reasonable

**6.** The majority criticizes my opinion for reading the above "out of context," since the particular expression is set out in connection with a different claim. Majority Opinion, at 326–27 n. 14, 25 A.3d at 303 n. 14. My response is as follows.

Over the past decade, this Court has imposed more and more mandates and strictures on capital petitioners seeking appellate post-conviction review. *See, e.g., McGill*, 574 Pa. at 587–90, 832 A.2d at 1022–23. Indeed, in *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693 (1998), the Court retroactively imposed a mandatory multi-part analytical overlay on derivative post-conviction claims in the death-penalty arena. *See id.* at 45, 720 A.2d at 700. After having increased the briefing burden multi-fold in such cases, for reasons which are beyond the scope of this opinion, the Court now appears to be in the process of decreasing the allowed length of the briefs. *See, e.g., Commonwealth v. Roney*, 587 CAP, *per curiam* Order (Pa. June 9, 2011); *Commonwealth v. Spotz*, 610 CAP, *per curiam* Order (Pa. June 11, 2011).

Particularly against this landscape, I fail to see how it does anyone any good to require these appellants to repeat every detail of every theme running through their briefs within every subpart of the submissions. Moreover, the task of solidifying the arguments against a factual context would be far simpler on a developed evidentiary record, had a hearing been allowed, as I believe it should.

Finally, the Court appears willing to rely on the many constraints facing trial attorneys representing capital defendants when passing on challenges to their stewardship. I have difficulty appreciating why there is not some concomitant appreciation of various limitations impacting presentations by appellate counsel when we read their briefs.

**7.** Although no definitive conclusions can be drawn, the Commonwealth's unexplained stipulation to penalty-phase relief suggests the possibility of deficient stewardship at least in that phase of trial.

investigation is a prerequisite to the formulation of reasonable strategy).

Next, I differ with the majority's pronouncement that the other-bad-acts evidence was not inflammatory or extensive. *See* Majority Opinion, at 330–31, 25 A.3d at 306. In fact, the prosecutor highlighted the assertions in connection with a compelling argument advancing the Commonwealth's theory that the motive for the killing centered on Appellant's thwarted desire for domination. *See id.* at 334, 25 A.3d at 308–09 (quoting the relevant passage from the district attorney's closing). I also have difficulty with the majority's explanation that a limiting instruction might well have served only to reemphasize the evidence to the jurors, *see id.* at 330–31, 25 A.3d at 306, since, particularly after the prosecutor's potent remarks, its seems unlikely they would have forgotten it. Moreover, the attribution of such a strategy to trial counsel (see *id.*), in the absence of an evidentiary record, seems, again, to be gleaning.

As to the claims of deficient stewardship for failing to investigate and present the alternate defense of diminished capacity, I agree with the majority that prevailing law is that such a defense cannot be presented in the alternative to an innocence-based one. *See id.* at 311–313.[8] However, I question the majority's suggestion that trial counsel had no basis to consider investigating alternative defenses. In this regard, the majority repeatedly asserts that counsel was confronted with overwhelming evidence that Appellant perpetrated the killing. *See, e.g., id.* at 300 n. 13. It seems logically inconsistent to say counsel lacked any obligation to probe the possibility of alternative defenses. *See id.* at 314. *Cf. Commonwealth v. Davido,* 582 Pa. 52, 80, 868 A.2d 431, 447 (2005) (Castille, C.J., concurring) (commenting that attorneys "are not potted plants").

Next, I differ with the majority to the degree it suggests some material difference between an unsworn declaration and an affidavit for purposes of determining the availability of an evidentiary hearing. *See* Majority Opinion, at 343 n. 19, 25

8. Parenthetically, I have expressed a willingness to reconsider this prohibition upon appropriate arguments. *See Commonwealth v. Spotz,* 587 Pa. 1, 107–08, 896 A.2d 1191, 1254–55 (2006) (Saylor, J., concurring and dissenting). Such arguments are not developed here, however.

A.3d at 313–14 n. 19. Our rules only require that a petitioner provide "affidavits, records, documents, or other evidence which show the facts stated" in a PCRA petition. Pa. R.Crim.P. 902(D). Declarations have long been accepted by the Court to assist in evaluating whether a hearing is required on a petitioner's proffer. In light of the limited purposes for which such documents are submitted—which is not to prove a claim, but merely to demonstrate that material facts are in issue and an evidentiary record should be developed—I do not see why the distinction between the different forms of submissions continues to be highlighted in our opinions.

In summary, and in line with many of my previous expressions, I believe that the appropriate way for this Court to address the intractable difficulties which have arisen in the death-penalty arena is to consistently enforce the requirement of an evidentiary hearing where material facts are in issue; to require appropriately developed factual findings and legal conclusions of the PCRA courts; and to apply consistent and fair review criteria on appeal.[9] It is my considered position there remains a great need for improvement in each of these areas.

---

9. Early in my tenure on the Court, we attempted to set forth a roadmap for such decision-making in the 1999 decision of *Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167 (1999), albeit differing majority views on this subject certainly have surfaced in the aftermath.